**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

# EXHIBIT A

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1

Stacy L. Fode, Esq. (SBN 199883)
sfode@nfclegal.com

2

Nana J. Yee, Esq. (SBN 272783)
nyee@nfclegal.com

3

Kirsten McCaw Grossman
kgrossman@nfclegal.com

4

*Pro hac vice forthcoming*

5

**NUKK-FREEMAN & CERRA, P.C.**
550 West C Street, Suite 910

6

San Diego, California 92101

7

Telephone: 619.292.0515
Facsimile:  619.566.4741

8

9

*Attorneys for Plaintiff*
AMERIS BANK

10

11

### UNITED STATES DISTRICT COURT

12

### CENTRAL DISTRICT OF CALIFORNIA

13

14

AMERIS BANK, a Georgia corporation,

Case No. 8:26-cv-00393

15

16

Plaintiff,

**AMERIS BANK'S COMPLAINT
AGAINST PATRICK BYRNE FOR:**

17

vs.

18

PATRICK BYRNE, an individual,

**1) BREACH OF CONTRACT;**
**2) TRADE SECRET
   MISAPPROPRIATION IN
   VIOLATION OF THE DEFEND
   TRADE SECRETS ACT, 18 U.S.C.
   § 1832 et seq.**
**3) TRADE SECRET
   MISAPPROPRIATION IN
   VIOLATION OF CAL. CIV.
   CODE §§ 3426 et seq. ("CUTSA")**
**4) VIOLATION OF CALIFORNIA
   PENAL CODE § 502**
**5) CONVERSION**

19

20

Defendant.

21

22

23

24

25

26

**JURY TRIAL DEMANDED**

27

28

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

Plaintiff AMERIS BANK ("Ameris" or "Plaintiff") brings this action against Defendant PATRICK BYRNE ("Byrne" or "Defendant") and alleges as follows:

## INTRODUCTION

1.     Ameris brings this lawsuit to protect the confidential, proprietary and trade secret information belonging to Ameris, its customers, and its employees.  Byrne is a former employee of Ameris and was formerly employed as CEO of Ameris's Balboa Division ("Balboa"), which Byrne previously owned and sold to Ameris in December 2021 for approximately ***$187 Million Dollars***. Following the sale, Ameris hired Byrne pursuant to an Employment Agreement and an extremely lucrative incentive compensation package that paid Byrne millions more in compensation during the two and a half years he was employed by Ameris.

2.     Following the purchase of Balboa by Ameris and in accordance with the terms of his Employment Agreement, Byrne was subject to the policies and procedures of Ameris. This included those designed to protect confidential, proprietary and trade secret information held by Ameris and to which certain Ameris employees, like Byrne, had access in connection with their job duties.

3.     Unbeknownst to Ameris at the time, Byrne did not comply with his obligation to maintain the secrecy of the confidential, proprietary and trade secret information to which he had access as an Ameris employee.  Instead, from the outset of his employment until his termination, on numerous occasions, Byrne sent ***hundreds*** of Ameris documents consisting of ***thousands*** of pages of confidential, proprietary and trade secret information belonging to Ameris from his Ameris e-mail account to his personal, ***unencrypted*** e-mail account in blatant disregard of Ameris policy. The information contained in the documents included everything from personally identifiable information ("PII") regarding Ameris employees, attorney-client privileged communications between Ameris and its attorneys, detailed and commercially sensitive trade secret information relating to Ameris customers and their loans (including customers' names, dates of birth, credit scores, and social security numbers), and other detailed proprietary and trade secret

---

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1    information relating to Ameris, its business operations and finances.

2    4.    To put it mildly, Byrne did everything he could following his termination to

3    hide his misappropriation of Ameris's confidential, proprietary and trade secret

4    information. Upon discovering Byrne's misappropriation in September 2025, Ameris

5    demanded the return and destruction of the confidential, proprietary and trade secret

6    information Byrne took from Ameris. ***To date, Byrne has refused to return or destroy***

7    ***the information he took from Ameris.*** Compounding this misconduct, Byrne also refused

8    to return his Ameris laptop after his termination. Upon information and belief, Byrne

9    knew that doing so would have expedited Ameris's discovery of his theft.

10    5.    While Ameris's investigation is ongoing, the information Ameris has

11    uncovered to date demonstrates that Byrne breached his contractual obligations to Ameris

12    and misappropriated documents containing confidential, proprietary and trade secret

13    information belonging to Ameris. Byrne's conduct and continued possession of these

14    documents was and is deliberate, unlawful, and poses the very real risk of a data breach.

15    Therefore, in addition to damages, Ameris seeks a permanent injunction requiring Byrne

16    to return the documents he stole from Ameris without retaining any copies or forensic

17    artifacts or other data from which the documents or information therein can be recreated.

18    Ameris also requests injunctive relief requiring the immediate return of the Ameris laptop

19    Byrne used while employed.

20    **PARTIES**

21    6.    Ameris is a Georgia corporation with its principal place of business in

22    Atlanta, Georgia.

23    7.    Byrne is an individual who, upon information and belief, resides in Orange

24    County, California.

25    **JURISDICTION AND VENUE**

26    8.    The Court has subject matter jurisdiction over this action pursuant to 28

27    U.S.C. § 1332 because the parties are citizens of different States and the amount in

28    controversy exceeds $75,000.00, excluding interest and costs. Ameris alleges that Byrne

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

has misappropriated and retained hundreds of Ameris documents containing thousands of pages of Ameris's confidential, proprietary and trade secret information, in violation of Byrne's Employment Agreement, federal, state and common law. This conduct has caused substantial damage to Ameris, including causing Ameris to expend well over $75,000.00 to investigate the extent of Byrne's misappropriation and attempt to recover and remediate its property and information.

9. Additionally, the Second Claim for Relief arises under the Defend Trade Secrets Act, 18 U.S.C. § 1832 *et seq*. Therefore, this Court has original subject matter jurisdiction over this claim pursuant to 28 U.S.C. § 1331 *et seq*.

10. The First, Third, Fourth and Fifth Claims for Relief arise under California statutory and common law. This Court has concurrent subject matter jurisdiction over these Claims for Relief on the basis of supplemental jurisdiction under 28 U.S.C. § 1367(a), because: (a) the federal and state law claims asserted herein are based, in part, upon the same operative facts; (b) the Court's exercise of jurisdiction over the pendent state law claims will promote judicial economy, convenience, and fairness to the parties; and (c) such claims are so related to the Second Claim for Relief that they form part of the same case or controversy under Article III of the United States Constitution.

11. Personal jurisdiction is proper in the Central District of California because Byrne resides in this District and has maintained sufficient minimum contacts with this District at all relevant times herein.

12. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b)(2) because Byrne is domiciled and worked in this District at all relevant times herein, and a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

/ / /

/ / /

/ / /

/ / /

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

## GENERAL ALLEGATIONS

### The Sale of Balboa to Ameris and Byrne's Employment with Ameris

13.     Ameris opened its doors as American Banking Company on October 1, 1971. What started as one location in Moultrie, Georgia and $1 million in capital has evolved into a publicly traded bank headquartered in Atlanta, Georgia.

14.     As a state-chartered commercial bank, Ameris is regulated and insured by the Federal Deposit Insurance Corporation ("FDIC").

15.     Prior to December 10, 2021, Balboa Capital Corporation ("Balboa") was an online provider of business lending solutions to small and mid-sized businesses nationwide for the purchase or lease of equipment.

16.     Balboa was headquartered in Costa Mesa, California.

17.     Defendant Byrne was the co-founder of Balboa and, through his trusts, was the sole owner of Balboa on December 10, 2021.

18.     Defendant Byrne was also the Chief Executive Officer of Balboa.

19.     On December 10, 2021, Byrne, Balboa and Ameris entered into a Stock Purchase Agreement pursuant to which Ameris acquired Balboa. Balboa became a division of Ameris.

20.     In connection with the sale of Balboa to Ameris, Byrne was hired as an employee by Ameris, with the title of CEO of the Balboa division.

21.     Byrne's employment with Ameris was governed by an Employment Agreement dated December 10, 2021 ("Employment Agreement"). The Employment Agreement was for a term of just over three years, ending on December 31, 2024, with the option to renew.

22.     After the acquisition, Byrne's job duties remained largely the same as prior to the acquisition. However, like all employees of Balboa, Byrne became an employee of Ameris, who was subject to Ameris's policies and who was not granted any permission or rights to misuse or misappropriate Ameris's documents.

/ / /

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

23.    Following the acquisition by Ameris, Byrne reported to James LaHaise, Ameris's Chief Strategy Officer.

**Byrne's Access to Ameris's Confidential, Proprietary and Trade Secret Information**

24.    The banking and financial services industry is highly regulated and subject to a multitude of statutes, regulations, guidances and orders. The industry is also subject, without limitation, to the provisions of Title V, Subtitle A of the Gramm-Leach-Bliley Act ("GLBA"), Financial Services Modernization Act of 1999, 15 U.S.C. § 6901 *et seq.*, which governs the treatment of nonpublic personal information by financial institutions. GLBA authorized the federal financial institution regulatory agencies to adopt regulations to implement those provisions and the pre-existing provisions of the Fair Credit Reporting Act. Under GLBA, and its implementing regulations, including 12 CFR Part 1016 *et seq.*, Privacy of Consumer Financial Information (Regulation P), a financial institution is prohibited from disclosing nonpublic personal information to nonaffiliated third parties, unless the institution satisfies various notice and opt-out requirements.

25.    The industry is further subject to additional consumer privacy laws and regulations under state law, including those protecting consumers' employment-related personal data and requiring consumer privacy disclosures, such as the California Consumer Privacy Act, California Civil Code §§1798.100-199 and its implementing regulations at 11 California Code of Regulations §§ 7000 *et seq.* ("CCPA").

26.    In connection with his job duties, Ameris provided Byrne with access to large amounts of highly valuable confidential, proprietary and trade secret information belonging to Ameris, including "Confidential Information"[1] as defined in Byrne's

---

[1] As defined in Byrne's Employment Agreement, the term "Confidential Information" means: [A]ll information which is or becomes known to Executive as a direct or indirect consequence of or through Executive's service relationship with any member of the Company Group (whether before, during or after the Term) and relates to matters such as trade secrets (including know-how, formulas, compositions, manufacturing and products processes, methodologies, technical data, designs, drawings and specifications), research and development activities, inventions, new or prospective lines of business (including

---

*AMERIS BANK v. PATRICK BYRNE*                      Case No.  8:26-cv-00393
COMPLAINT FOR DAMAGES                                                Page 5

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

Employment Agreement. This information included, but was not limited to, contractual agreements with Ameris customers; lists of past, present and prospective customers, customer files and/or customer correspondence, customer requirements and other customer data not generally available to the public, including customer information within the scope of the GLBA; Ameris financial and marketing information and projections, including, but not limited to, market surveys, marketing objectives and marketing strategies; Ameris products and services and pricing for same, information about costs, profits, sales and markets, Ameris internal legal metrics; and Ameris business methods and procedures, including, but not limited to, Ameris operations and/or processes.

27.    Byrne also had access to substantial amounts of Confidential Information relating to Ameris employees in the Balboa division, including, but not limited to, contact information, information regarding wages, bonuses, incentives and tax withholding, 401(k) and Roth IRA contributions, insurance information, and information regarding employee leaves of absence and paid time off.

28.    Ameris is highly protective of its confidential, proprietary and trade secret information and goes to great lengths to protect it from unauthorized use or disclosure.

29.    Ameris invests millions of dollars every year in the systems, processes and employee training necessary to generate and secure the confidential, proprietary and trade secret information to which Byrne had access.

---

analysis and market research relating to potential expansion of the business), business plans, books and records, financial or business data, customer lists, financing, vendor lists, suppliers, purchasers, potential business combinations, distribution channels, services, procedures, pricing information and any other proprietary information relating to the Company Group, in each case as they may exist from time to time and regardless as to whether or not such information is marked as confidential or proprietary; provided, however, that the term "Confidential Information" shall not include any information that is or becomes generally available to the public (other than as a result of a disclosure by Executive in violation of this Agreement or other obligation or by a person who received such information from Executive in violation of this Agreement or other obligation).

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

30.    Much of the information to which Byrne had access, in particular information relating to Ameris's employees and customers, would be highly valuable to a competitor. Some of the information, including the Ameris employee and customer PII, would be valuable to bad actors who could potentially misuse the information in connection with criminal conduct.

**Byrne's Contractual Obligations to Safeguard Ameris's Confidential, Proprietary and Trade Secret Information**

31.    Ameris's efforts to protect its confidential, proprietary and trade secret information from disclosure includes requiring its employees to enter into various agreements requiring employees to maintain the confidentiality of Ameris information and comply with Ameris policies designed to protect it.

32.    During and as a condition of his employment, Byrne was required to annually acknowledge and to comply with Ameris policies and procedures. Byrne also specifically acknowledged the confidentiality of Ameris's proprietary and trade secret information annually.

33.    For example, Byrne's Employment Agreement contains the following provision:

> Except as provided in this Section 4.14.1 or with the prior written consent of an authorized officer of the Company, Executive shall not (1) disclose any Confidential Information of the Company Group to any person, firm, corporation, association or other entity for any reason or purpose whatsoever, other than in the performance of Executive's duties pursuant to this Agreement and in accordance with any restrictions placed on its use or disclosure by the Company Group, or (2) make use of any such Confidential Information for Executive's own purposes or for the benefit of any person, firm, corporation, association or other entity, except the Company Group.

34.    In connection with his employment with Ameris, Byrne also electronically signed Ameris's Confidential Information Agreement ("CI Agreement"), which states that "except as required in the course of his/her employment by Ameris Bank, [Byrne] will not duplicate, remove, transfer, disclose or utilize, nor knowingly allow any other

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1    person to duplicate, remove, transfer, disclose or utilize" Ameris confidential information

2    and/or trade secrets.

3        35.    The CI Agreement also required Byrne "to hold all such Confidential

4    Information in strict confidence, and not publish or otherwise disclose any portion thereof

5    during [Byrne's] employment and for a two (2) year period after termination except with

6    prior written consent of the President of Ameris Bank."

7        36.    The CI Agreement also required Byrne to "make no use of any such

8    Confidential Information except such use as is required in the performance of [Byrne's]

9    duties for Ameris Bank or with prior written consent of the President of Ameris Bank."

10        37.    The CI Agreement required Byrne, upon termination of his employment, "to

11    deliver to Ameris Bank, without copying or summarizing, all written materials and all

12    models, mechanisms, documents, records, and tangible things and the like containing or

13    relating to such Confidential Information, all of which shall be and remain the sole

14    property of Ameris Bank. For this purpose, 'written materials' shall be deemed to include

15    letters, memoranda, reports, notes, notebooks, books of account, data, drawings, prints,

16    plans, specifications, formulas and all other documents or writings, and all copies

17    thereof."

18        38.    Finally, the CI Agreement contained the following provision relating to

19    Trade Secrets:

20        With respect to any Trade Secrets, whatever their nature and form and whether
       obtained orally, by observation, from written materials or otherwise during or as
21        the result of [Byrne's] employment by Ameris Bank, [Byrne] agrees:

22

23            a.  To hold all such Trade Secrets except such use as is required in the
               performance of [Byrne's] duties for Ameris Bank or with prior written
24               consent of the President of Ameris Bank;

25            b.  To make no use of any such Trade Secrets except such use as is required
               in the performance of [Byrne's] duties for Ameris Bank or with prior
26               written consent of the President of Ameris Bank;

27            c.  Upon termination of [Byrne's] employment, whether voluntary or
               involuntary, or upon Ameris Bank's request, to deliver to Ameris Bank,
28               without copying or summarizing, all written materials and all models,

---

*AMERIS BANK v. PATRICK BYRNE*                    Case No.  8:26-cv-00393
COMPLAINT FOR DAMAGES                                         Page 8

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

mechanisms, documents, records, and tangible things and the like containing or relating to such Trade Secrets, all of which shall be and remain the sole property of Ameris Bank. For this purpose, 'written materials' shall be deemed to include letters, memoranda, reports, notes, notebooks, books of account, data, drawings, prints, plans, specifications, formulas and all other documents or writings, and all copies thereof.

39.    In connection with his employment with Ameris, Byrne also electronically signed Ameris's Acceptable Use Policy relating to the acceptable use of Ameris's computer systems, networks, mobile devices, removeable media, internet, voice systems, and e-mail communications.

40.    The Acceptable Use Policy contains numerous requirements designed to safeguard Ameris and customer information from improper disclosure by employees, including, but not limited to, the following:

- Locking computers when left unattended;
- Logging off when leaving the bank;
- Immediate reporting if Ameris equipment is lost or stolen;
- Changing passwords if an employee knows or suspects it is no longer secure;
- Changing passwords that meet or exceed network requirements;
- Changing passwords when required by established parameters for password age;
- Prohibiting the use of portable storage devices and drives including thumb drives;
- Prohibiting employees from connecting any computing devices to the Ameris network unless specifically authorized by the Information Technology Department.

41.    The Acceptable Use Policy also expressly prohibits employees from "[s]end[ing] customer information, such as account numbers, passwords, etc. by unencrypted email." Ameris further requires employees to report any information breach, including, but not limited to, the unauthorized sending or receiving of e-mails that contain attachments containing PII and intellectual property of Ameris.

42.    The Acceptable Use Policy also prohibited Byrne from revealing or publicizing confidential or proprietary information, including financial information,

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

confidential client information, marketing strategies and plans, databases and information contained therein, client lists, computer software source codes, computer/network access codes, and business relationships.

43.    The Acceptable Use Policy provides that employees who violate its guidelines may be subject to disciplinary action, including written warnings, revocation of access privileges, and termination.

44.    In exchange for his agreement to comply with Ameris policies requiring the safeguarding of confidential, proprietary and trade secret information, Byrne received $187 Million Dollars in connection with the sale of Balboa, and millions more in employment compensation over the next two and a half years of his employment.

## Other Measures Taken by Ameris to Protect its Confidential, Proprietary and Trade Secret Information

45.    In addition to requiring its employees with access to confidential, proprietary and trade secret information to execute confidentiality agreements, Ameris takes numerous other measures to protect its confidential, proprietary and trade secret information from disclosure.

46.    At all times throughout the relevant period, Ameris has maintained, and continues to maintain, robust information security and privacy policies to protect consumer and employee data as well as other types of confidential and proprietary business information in accordance with applicable law and industry best practices. These policies and practices include, inter alia, adhering to or surpassing industry standards for cyber security, data encryption and network security; conducting regular risk assessments and external audits; designating personnel responsible for enforcing the security of physical and electronic informational platforms and appropriately classifying, and limiting access to, confidential and proprietary information.

47.    For example, Ameris's Information Technology Department maintains an inventory of all approved electronic devices by type and serial number. Only devices specifically approved by the Information Technology Department may be connected to

---

*AMERIS BANK v. PATRICK BYRNE*
COMPLAINT FOR DAMAGES

Case No.  8:26-cv-00393
Page 10

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

the Ameris computer network, and any device used to transfer or transport data must use 256-bit Advanced Encryption Standard (AES) hardware-based encryption.

48.    In addition, all employees of Ameris, including Byrne, are required to undergo training upon commencement of employment by Ameris and annually thereafter. Among other subjects, the training provided to employees reviews Ameris's confidentiality and data security policies and procedures as well as the requirements of applicable law.

49.    Ameris policy, as repeatedly emphasized to Byrne during Ameris's employee training, prohibited him from taking and obtaining personal possession of any Confidential Information outside Ameris's physical locations, except on Ameris issued and owned computer devices, systems, servers, or networks, and then only in accordance with his specific job requirements. Byrne neither requested nor received any waiver of or exceptions to this policy.

50.    Even with respect to the confidential, proprietary and trade secret information made available to Byrne in connection with the performance of his duties as the CEO of the Balboa division, Byrne never requested, and Ameris never gave Byrne, consent, permission, approval or authorization to retain such information for any purpose.

51.    During his employment with Ameris, Byrne understood that he was required to maintain Ameris's confidential, proprietary and trade secret information in strict confidence.

**The Termination of Byrne's Employment and Byrne's Lawsuit Against Ameris**

52.    Ameris terminated Byrne's employment on or about June 27, 2024.

53.    At the time of his termination, Ameris requested the return of Byrne's Ameris-owned laptop.

54.    Byrne refused to return the laptop.

55.    On or about September 16, 2024, Byrne filed a lawsuit against Ameris in the United States District Court for the Central District of California, Southern Division. Byrne's lawsuit alleges wrongful termination in violation of California public policy,

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

retaliation in violation of California Labor Code, failure to pay wages due at termination and unfair competition in violation of California law.

56.    The thrust of Byrne's lawsuit is that Ameris terminated him due to his complaints about the calculation of his Long-Term Incentive Plan ("LTIP") compensation.  Byrne claims that Ameris did not calculate his LTIP compensation properly and owes him additional compensation.

57.    Ameris has denied Byrne's claims.

58.    Following his termination, Ameris continued to demand that Byrne return his Ameris laptop and any other Ameris property in his possession, including on January 7, 2025, January 17, 2025, March 4, 2025, November 6, 2025 and November 12, 2025. Bryne insisted that he was not in possession of any Ameris property, despite not returning the Ameris laptop.

59.    Byrne's wrongful termination lawsuit is still pending.  Fact discovery in that lawsuit closed on November 28, 2025.

### Ameris Discovers That Byrne Violated His Obligation to Keep Confidential, Proprietary and Trade Secret Information Secure by Forwarding It to His Personal E-Mail Account

60.    In or about September 2025, Ameris commenced review of ESI in connection with Byrne's lawsuit against Ameris, including the contents of Byrne's Ameris e-mail account.

61.    Ameris's investigation, which is still ongoing, has revealed that on numerous dates throughout his employment, Byrne sent multiple e-mails from his Ameris e-mail account to his personal e-mail account. The e-mails Byrne sent to his personal account attached hundreds of documents containing **_thousands of pages_** of highly sensitive confidential, proprietary, trade secret and attorney-client privileged information and communications relating to Ameris, its employees and its customers.

62.    The confidential, proprietary and trade secret information contained in the Ameris documents that Bryne sent to his personal email account includes the following:

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

a.  Information relating to customer leases and accounts, which included sensitive customer banking and financial information, including without limitation, dates of birth, addresses, credit scores, and social security numbers;

b.  Detailed nonpublic financial information relating to Ameris and the Balboa division, including profit and loss statements, budget forecasts, income projections, strategic plans and risk assessments;

c.  Non-public Ameris business strategy slide decks, meeting minutes and notes related to the slide decks;

d.  Non-public financial information relating to the contemplated acquisitions of various entities;

e.  Balboa division Income Statements and Balance Sheets from October 2022 - March 2024;

f.  PII regarding Balboa division employees, salary and bonus information and information regarding employee leaves of absence; employee names and contact information, information regarding wages, bonuses, incentives and tax withholding, 401(k) and Roth IRA contributions, insurance information, and information regarding employee leaves of absence and paid time off.

g.  Attorney-client privileged communications between Ameris's Chief Legal Officer and various Ameris executives;

h.  Legal Metrics reports containing: 1) attorney-client privileged communications and work product, including legal strategy and voluminous billing records relating to legal services provided to Balboa and Ameris; and 2) highly sensitive customer data, including the identities and details of customer loans, payment status and guarantor information; and

i.  Summaries of attorney-client and bank examination privileged communications.

/ / /

---

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

63. While there was an uptick in the volume of Ameris documents Byrne sent from his Ameris e-mail account to his personal e-mail account in the final days of his employment, Byrne sent documents in this manner **throughout** his employment with Ameris.

64. For example, on May 7, 2022, Byrne sent an email to his personal e-mail account attaching a spreadsheet entitled "Copy of Declines Q1 2022 with tabs.xlsx," which contains highly sensitive customer information regarding approximately 4,800 leases that included borrower names, equipment cost, equipment description, industry, parent vendor, vendor, time in business, FICO score, CBR Trades (credit bureau report tradelines), open trades (open tradelines), BCSCA (business credit score-commercial account), capacity, capacity %, Paynet score, Balboa score, credit grade, reason for decline and other notes, including financial information relating to the loans' personal guarantors.

65. On June 17, 2022, Byrne sent an email to his personal e-mail account attaching a spreadsheet entitled "EarlyPaymentDefaultReport.xlsx," which contains highly sensitive information regarding 23 customers' delinquent leases, including names, address, broker information, commission information, and amounts due for each lease/loan identified. The spreadsheet also contains **attorney-client privileged** commentary from Ameris's Legal Department regarding the delinquent customer leases.

66. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

67. On March 10, 2022, March 11, 2022, March 30, 2022, April 6, 2022, April 13, 2022, April 27, 2022, May 4, 2022, August 24, 2022, Byrne sent emails to his

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

personal e-mail account, attaching spreadsheets entitled "LegalMetrics.xlsx," which contain detailed legal metric reports for hundreds of leases with lease numbers and associated names of lessees, including details related to lawsuits filed by Balboa, with important dates in the litigations, amounts sought by Balboa, counsel information, attorney fees incurred, invoiced, and legal line items for amounts invoiced.

68. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

69.     On September 7, 2022, Byrne sent an email to his personal e-mail account, attaching several spreadsheets including one entitled "Top Vendors AUG 8-31-22.xls," which contains highly sensitive information regarding Ameris's vendors, including a ranked list of the top 100 vendors, with names and amounts funded by each vendor.

70.     On January 25, 2024, Byrne sent an email to his personal e-mail account including the comments from another Ameris employee's performance review.

71. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

72. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Byrne also sent himself a spreadsheet entitled "STIP Deals – Booked vs Cash Received Q1 2024,"

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1   which includes hundreds of customer account numbers, lease numbers, lease terms, the

2   credit and debit amounts on the leases with each client, and how much is still owed.

3          73.    ███████████████████████████████████████████████████

4   ███████████████████████████████████████████████████████████████████

5   ███████████████████████████████████████████████   Byrne produced over

6   1,000 Ameris documents containing thousands of pages of confidential, proprietary and

7   trade secret information, including 48 voluminous spreadsheets, some of which are

8   hundreds of pages long. Plaintiff's production included: a) spreadsheets containing a list

9   of thousands of customer names and identifiers, corresponding lease information

10  including lease numbers, equipment descriptions, lease terms and financial information

11  relating to each lease; ████████████████████████████████████████████

12  ███████████████████████████████████████████████████████████████████

13  █████████████████████████████████████████.

14         74.    A comparison of the documents Byrne produced with the e-mails Ameris

15  discovered during its ESI review of his Ameris e-mail account revealed that Byrne had

16  only produced misappropriated Ameris documents that he believed related to the

17  calculation of his LTIP award. Byrne withheld many other documents he

18  misappropriated, including, notably, documents containing details relating to Ameris's

19  customers and loans, attorney-client privileged communications and employee PII.

20         75.    Moreover, Byrne's document production did not include *any* of the e-mails

21  *forwarding* the Ameris documents from his Ameris e-mail account to his personal e-mail

22  account. Upon information and belief, this was an attempt by Byrne to disguise *how* he

23  had come to possess the Ameris documents.

24         76.    Byrne finally produced some of the e-mails from his own personal account

25  attaching the documents he took, but not until December 1, 2025 – *the day after*

26  *discovery closed in his own lawsuit against Ameris.*

27         77.    During his October 27, 2025 deposition in connection with his lawsuit

28  against Ameris, Byrne admitted what Ameris was uncovering in its own investigation –

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

that he had e-mailed numerous documents from his Ameris e-mail account to his personal e-mail account. Plaintiff also admitted that the company's non-public financial information (including profit and loss statements, Balboa assets, liability and equity, budget forecasts and income projections), information relating to Balboa's loans, loan assessments, risk assessments, strategic plans, priorities and timelines, client information, and personal information about Balboa's employees, including salary, overtime, sales and origination quotas, and performance evaluations, was confidential. In short, Plaintiff conceded that most of the documents he sent to his personal e-mail account contained confidential Ameris information.

78.    Byrne also acknowledged during his deposition that certain documents were saved on his personal computer, and that he also had "things in the cloud."

79.    Plaintiff testified that he understood that he was prohibited from removing or transferring confidential or trade secret information, "except for as required in the course of his or her employment."

80.    Plaintiff understood that he was required to return the company's confidential information upon termination of employment.

81.    When asked whether he received permission to send Ameris documents to himself, Plaintiff responded that "it was pretty common knowledge that I would use my personal computer for – yeah, to work at home."

82.    When pressed as to whether he received express permission to send Ameris documents to himself, Byrne admitted that he did not know if he "got specific permission to send documents."

83.    Byrne further testified that he could not recall whether anyone at Ameris authorized him to keep Ameris documents after his employment ended.

84.    Byrne explained that while he could not recall returning Ameris documents after his employment ended, "Ameris never asked for them back as well."

85.    Byrne was incorrect.  In fact, Ameris did ask Plaintiff to return any Ameris property and "company confidential trade secret, client or customer information" – *in*

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1    *writing* – at the time he was terminated and thereafter.

2        86.    When asked why he sent Ameris documents to his personal e-mail account,

3    Byrne stated that "it was pretty clear that [he] was going to use them for this lawsuit"

4    because he "didn't feel confident that Ameris would disclose" the documents.

5        87.    Byrne further testified that he had sent ***all*** Ameris documents he forwarded

6    to his personal e-mail account to his then counsel, Esperanza Anderson. However, as

7    discussed above, it appears that Byne only produced the Ameris documents he took that

8    he believed supported his claims against Ameris, while the rest were withheld.

9        88.    Notwithstanding Byrne's claim that the thousands of pages of Ameris

10   documents he took throughout his employment related to his claims against Ameris, in

11   fact, many of the ***most sensitive*** documents Byrne sent himself (for example, the

12   documents containing employee PII, customer loan information and attorney-client

13   privileged communications) have ***no relevance whatsoever*** to his lawsuit.

14       89.    Moreover, many of the documents Byrne misappropriated were sent ***years***

15   before his employment with Ameris was terminated, presumably long before he would

16   have contemplated suing the company.

17   **<u>Byrne Ignores Ameris's Efforts to Recover its Confidential, Proprietary and</u>**
18   **<u>Trade Secret Information and the Ameris Laptop He Retained</u>**

19       90.    As discussed above, in addition to Byrne's misappropriation of thousands of

20   pages of documents containing confidential, proprietary and trade secret information

21   relating to Ameris, its customers and employees, Byrne also refused to return the Ameris

22   laptop assigned to him during his employment. As discussed above, Ameris had

23   requested the return of all company property, including the laptop, in June 28, 2024

24   correspondence immediately following Byrne's termination.

25       91.    Following Byrne's termination, Ameris "locked" the laptop Byrne retained,

26   so that he would no longer have access to anything on it, including any documents saved

27   locally. Once the laptop was returned, Ameris could "unlock" the laptop in order to

28   review Byrne's activity on the laptop.

---

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

92. Ameris continued to seek the return of the laptop, including on January 7, January 17, and March 4, 2025.

93. Byrne never returned the laptop, claiming that he could not recall what happened to it.

94. After Byrne's deposition, Ameris's counsel sent correspondence to Byrne's counsel (Ms. Anderson) on November 6, 2025. Among other matters addressed, Ameris cited Byrne's confidentiality obligations to Ameris and demanded that Byrne identify and return all Ameris documents and property, including the documents that had not been produced but that Ameris had learned Byrne e-mailed to his personal e-mail account.

95. During a November 12, 2025 meet and confer telephone conference with Byrne's counsel, Ameris's counsel again demanded that Byrne return Ameris's property, including the Ameris laptop and documents containing Ameris's confidential and proprietary information. Ameris's counsel also inquired as to Byrne's claim during his deposition that he sent all of the documents he e-mailed to himself to Ms. Anderson.

96. In November 12, 2025 correspondence with Ameris's counsel (purportedly to memorialize that day's conference call), Ms. Anderson stated: "I have received many emails from Plaintiff from his email account shortly before his deposition and that I have not had a chance to parse through them."

97. Ms. Anderson further stated: "I told you that I will produce any documents that are responsive to the discovery requests and that I would search for, return and purge any documents *that are privileged*." However, as Ms. Anderson was well aware, Ameris's demand for the return of documents was not limited to privileged documents, but rather all documents containing Ameris's confidential, proprietary and trade secret information, *including* privileged documents.

98. Ms. Anderson also summarily rejected Ameris's request to image Byrne's personal computer and electronic devices, noting that the Court had previously denied the same request – **before** Ameris discovered Byrne's misappropriation of its confidential, proprietary and trade secret information.

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

99.    In November 17, 2025 correspondence directed to Ms. Anderson, Ameris's counsel *reiterated its demand for the identification and return of all Ameris documents and property*:

> As discussed on our call, during his October 27 testimony, Plaintiff admitted that the documents he was in possession of were confidential, that he knowingly forwarded himself these documents from his work email to his personal [email] account, that he may have put the documents on the cloud, and that he sent all such documents to you. Your comment that "I told you that I have received many emails from Plaintiff from his [personal email] account shortly before his deposition and that I have not had a chance to parse through them" is very troubling and raises further questions. Did you receive the documents "shortly before" Plaintiff's cancelled deposition on September 23, or his most recent testimony on October 27? Or earlier?  In any event, since you produced documents in late September, you were plainly on notice by September at the latest that you were in possession of confidential and privileged Ameris documents. You had an obligation to review and return the confidential documents immediately and purge any privileged documents.  Also,  how  did  Plaintiff  send  you  the  documents  at PLAINTIFF001088-1136, and where was Plaintiff storing these documents if you did not have any emails from Plaintiff at the time of Plaintiff's document production on September 20? Moreover, did you make any effort to compile Ameris confidential and privileged documents from Plaintiff prior to – or even upon - receiving document requests from Ameris on March 3, 2025?  If so, why did Plaintiff wait until September or October 2025 to send you any emails?

> Your assertion that you have been busy taking multiple defense witness depositions does not excuse Plaintiff or you from returning Ameris' confidential and privileged information. This should have been done, at the latest, when Plaintiff left Ameris.

> We again asked when Plaintiff will return Ameris' laptop. You responded only that you would "ask Plaintiff again." We further advised you that a forensic search of Plaintiff's personal devices is imperative and mandatory. You disagreed and claimed that Ameris previously sought this relief from the Court and the request was denied.  Your statement is inaccurate and baseless.

100.    Ameris also demanded the redaction and designation of documents produced by Byrne in his lawsuit that contained confidential information and/or information protected by the attorney-client and Bank Examination privileges.  While Byrne agreed to

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

stamp some of the documents "Confidential," Byrne refused to redact the documents containing Ameris's attorney-client privileged communications.

101.    Discovery closed in that matter on November 28, 2025, and Byrne did not produce, redact or return any of the requested documents by that date.

### In January 2026, Ameris Became Aware that Byrne's Assistant Was Also Given Access to Ameris Confidential Information Without Ameris's Knowledge

102.    On or about January 13, 2026, Ameris received the file of Deborah Dickson, the economic expert for Byrne in his lawsuit against Ameris.

103.    The file contained emails from Byrne's former assistant, Jacqueline Emert ("Emert"), to Byrne's expert on November 25, 2025 and December 18, 2025 attaching, inter alia, a spreadsheet containing a confidential pricing model with Ameris's non-public financial data. The spreadsheet was not produced in the lawsuit and was not generally available to Emert during the course of her work at Ameris. Ameris does not know how Emert could have come to possess it unless Byrne improperly disclosed it to her.

### Ameris is at Risk of a Serious Data Breach Due to Byrne's Misconduct

104.    While most personal emails are encrypted *in transit*, the email provider Byrne uses does not offer native, built-in, end-to-end encryption for its e-mail, meaning the contents of e-mails are not encrypted in a way that only the sender and recipient can access them. Therefore, anyone with access to Byrne's e-mail account (for example, by password compromise or hacking) may access the e-mail messages and documents contained in Bryne's email account in plain text.

105.    Moreover, the Ameris documents in Byrne's possession are also located on his personal computer and his cloud account, which are not secure.

106.    Ameris has sustained substantial damages with respect to Byrne's misconduct.

107.    Ameris's investigation is ongoing, and it reserves the right to add additional claims in the future as the evidence warrants.

/ / /

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

## COUNT I

### Breach of Contract

108.   Ameris refers to, and incorporates herein by reference, the allegations contained in paragraphs 1 through 107 of the Complaint as if fully set forth herein.

109.   Ameris and Byrne are parties to the Employment Agreement, Confidential Information Agreement, and Acceptable Use Policy.

110.   The agreements are supported by adequate consideration.

111.   Ameris has performed all of its obligations under the above-referenced agreements.

112.   The above-referenced agreements are legally binding contracts between Ameris and Byrne.

113.   Byrne materially breached the above-referenced agreements, inter alia, by: 1) forwarding numerous Ameris documents containing confidential, proprietary, trade secret and attorney-client privileged information and communications to his personal e-mail account; 2) refusing to return the documents upon the termination of his employment and/or upon demand by Ameris; 3) refusing to return his Ameris laptop upon the termination of his employment and/or upon demand by Ameris; and 4) making personal use of Ameris's confidential, proprietary and trade secret information.

114.   As a proximate result of Byrne's breaches of the Employment Agreement, Confidential Information Agreement, and Acceptable Use Policy, Ameris has sustained, and will continue to sustain, damages.

115.   Ameris has sustained, and will continue to sustain, damages, including, but not limited to, forensic data and legal costs, other costs relating to ensuring legal and regulatory compliance, costs to address Byrne's data breach, and attorney's fees, in an amount to be determined at trial.

/ / /

/ / /

/ / /

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

## COUNT II

**Misappropriation in Violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1832 *et seq*.**

116. Ameris repeats, realleges, and incorporates paragraphs 1 through 115 as if fully set forth herein.

117. Ameris engages in interstate commerce across the United States.

118. Ameris is the owner of certain documents relating to its business that contain financial, operations, economic and customer information. This information qualifies as "trade secrets" as defined by the DTSA.

119. Ameris's trade secrets derive independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use.

120. The trade secrets have been developed by Ameris at great time and cost.

121. Ameris closely guards and takes reasonable steps to protect against the unauthorized misappropriation and disclosure of trade secrets, including, but not limited to: (1) implementing the aforementioned policies and procedures to govern the access, use, and disclosure of information and documents, including providing unique usernames and passwords for logging in to the Ameris database, secured portal access, and utilizing encryption programs, among other security measures.

122. During the course of his employment relationship, Byrne was given access to Ameris's trade secrets, and had a duty to keep such information confidential.

123. As set forth above, Byrne was required to adhere to various Ameris policies regarding the access, use, and disclosure of Ameris's trade secrets. By engaging in the conduct discussed above, Byrne violated those policies.

124. As set forth herein, Ameris is already aware that Byrne took its trade secrets by improper means and has refused to return the information.

125. Ameris's investigation of Byrne's conduct, which is ongoing, has identified

---

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

multiple instances of misappropriation by Byrne. The misappropriation includes, but is not limited to, Byrne's actions in sending e-mails from his Ameris e-mail account to his personal email account, and attaching documents containing Ameris's confidential, proprietary and trade secret information for his own personal benefit or for the benefit of others.

126. Byrne's conduct, described herein, constitutes misappropriation of Ameris's trade secrets in violation of DTSA.

127. As a direct and proximate result of Byrne's violation of DTSA, Ameris has suffered damages, including, but not limited to, forensic data and legal costs, other costs relating to ensuring legal and regulatory compliance, costs to address Byrne's data breach, and attorney's fees.

128. In addition, on information and belief, Bryne's misappropriation was willful and malicious, with the wrongful and deliberate intent of injuring Ameris, and with a conscious disregard for Ameris's rights and Byrne's obligations under federal law. Ameris is therefore entitled to an award of compensatory and punitive damages and reasonable attorneys' fees and costs incurred herein in accordance with 18 U.S.C. § 1836(b)(3).

## COUNT III

**Misappropriation in Violation of Cal. Civ. Code §§ 3426 et seq. ("CUTSA")**

129. Ameris repeats, realleges, and incorporates paragraphs 1 through 128 as if fully set forth herein.

130. The California Uniform Trade Secrets Act ("CUTSA") prohibits any person from using the trade secrets of another for that person's commercial advantage. That Act defines trade secrets to include "information, including a formula, pattern, compilation, program, device, method, technique or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ.

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1  Code § 3426.1.

2    131.   Ameris is the owner of certain documents containing confidential,

3  proprietary and trade secret information, which includes, but is not limited to, financial,

4  operation, economic and customer information. The information constitutes "trade

5  secrets" as defined by CUTSA. Ameris's trade secrets derive independent economic

6  value, actual and potential, from not being generally known to, and not being readily

7  ascertainable by proper means by other persons who can obtain economic value from

8  their disclosure or use.

9    132.   The trade secrets have been developed by Ameris at great time and cost.

10    133.   By reason of his employment and high-level position with Ameris, Byrne

11  had access to Ameris's trade secrets.

12    134.   Ameris closely guards and takes reasonable steps to protect against the

13  unauthorized misappropriation and disclosure of trade secrets, including, but not limited

14  to: implementing the aforementioned policies and procedures to govern the access, use,

15  and disclosure of information and documents, including providing unique usernames and

16  passwords for logging in to the Ameris database, secured portal access, and utilizing

17  encryption programs, among other security measures.

18    135.   As set forth above, Byrne was required to adhere to various Ameris policies

19  regarding the access, use, and disclosure of Ameris's trade secrets. By engaging in the

20  conduct discussed above, Byrne violated those policies.

21    136.   As set forth herein, Ameris is already aware that Byrne took its trade secrets

22  by improper means and has refused to return the information.

23    137.   Ameris's investigation of Byrne's conduct, which is ongoing, has identified

24  multiple instances of misappropriation of Byrne. The misappropriation includes, but is

25  not limited to, Byrne's actions in sending e-mails from his Ameris e-mail account to his

26  personal email account, and attaching documents containing Ameris's confidential,

27  proprietary and trade secret information for his own personal benefit or for the benefit of

28  others.

---

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

138.    Byrne's conduct, described herein, constitutes misappropriation of Ameris's trade secrets in violation of CUTSA.

139.    As a direct and proximate result of Byrne's violation of CUTSA, Ameris has suffered damages, including, but not limited to, forensic data and legal costs, other costs relating to ensuring legal and regulatory compliance, costs to address Byrne's data breach, and attorney's fees.

140.    In addition, Bryne's misappropriation was willful and malicious, with the wrongful and deliberate intent of injuring Ameris, and with a conscious disregard for Ameris's rights and Byrne's obligations under California law. Ameris is therefore entitled to an award of compensatory and punitive damages and reasonable attorneys' fees and costs incurred herein pursuant to Cal. Civ. Code. § 3426.4.

## COUNT IV

### Violation of California Penal Code § 502

141.    Ameris repeats, realleges, and incorporates paragraphs 1 through 140 as if fully set forth herein.

142.    Byrne violated California Penal Code § 502 by, among other things, knowingly and without permission:

A. Wrongfully using Ameris's computer network to obtain Ameris's confidential, proprietary, trade secret and attorney-client privileged information and communications;

B. Wrongfully taking and/or copying Ameris's confidential, proprietary, trade secret and/or attorney-client privileged information and communications;

C. Wrongfully using Ameris's confidential, proprietary, trade secret and attorney-client privileged information and communications; and

D. Wrongfully using Ameris's computer equipment and network subsequent to the termination of his Ameris employment.

143.    Byrne's actions that constitute violations of California Penal Code § 502 were not committed within the scope of his lawful employment at Ameris and were not

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1    reasonably necessary to the performance of his job duties at Ameris.

2    144.   The value of Ameris computer equipment and services wrongfully used by

3    Byrne exceeds $1,000.

4    145.   Ameris has sustained damages as a proximate result of Byrne's actions,

5    including, but not limited to, forensic data and legal costs, other costs relating to ensuring

6    legal and regulatory compliance, costs to address Byrne's data breach, and attorney's

7    fees.

8    146.   In addition, Bryne's misappropriation was willful and malicious, with the

9    wrongful and deliberate intent of injuring Ameris, and with a conscious disregard for

10   Ameris's rights and Byrne's obligations under California law.

11   147.   Therefore, in addition to all other types of relief requested herein, Ameris is

12   entitled to recover compensatory and punitive damages and attorneys' fees in amounts

13   according to proof to be determined, in accordance with California Penal Code § 502.

## COUNT V

### Conversion

16   148.   Ameris repeats, realleges, and incorporates paragraphs 1 through 147 as if

17   fully set forth herein.

18   149.   At all times herein, Ameris owned, possessed, and had a right to possess its

19   documents containing confidential, proprietary, trade secret and attorney-client privileged

20   information and communications, including in the form of electronic, e-mail, and cloud-

21   based storage and printed materials.

22   150.   At all times herein, Ameris also owned, possessed, and had a right to possess

23   computer equipment loaned to Byrne to be used exclusively in connection with his job

24   duties on behalf of Ameris.

25   151.   Byrne substantially interfered with Ameris's property rights by knowingly

26   and intentionally taking possession of Ameris's documents containing confidential,

27   proprietary, trade secret and attorney-client privileged information and communications,

28   including information relating to Ameris's customers and employees, without Ameris's

---

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1  consent or authorization.

2      152.  Byrne further substantially interfered with Ameris's property rights by

3  knowingly and intentionally refusing to return, upon demand subsequent to Byrne's

4  termination, Ameris's computer equipment loaned to Byrne exclusively in connection

5  with his job duties on behalf of Ameris.

6      153.  Ameris was damaged as a result of Byrne's conduct, including, but not

7  limited to, forensic data and legal costs, other costs relating to ensuring legal and

8  regulatory compliance, costs to address Byrne's data breach, and attorney's fees.

9      154.  In addition, on information and belief, Bryne's conversion was willful and

10  malicious, with the wrongful and deliberate intent of injuring Ameris, and with a

11  conscious disregard for Ameris's rights and Byrne's obligations under California law.

12  Therefore, in addition to all other types of relief requested herein, Ameris is entitled to

13  recover compensatory and punitive damages in amounts according to proof to be

14  determined.

## **PRAYER**

16      WHEREFORE, Plaintiff Ameris respectfully requests that this Court enter

17  judgment as follows:

18      A.    For compensatory damages in an amount to be established at trial;

19      B.    For punitive damages, to the extent available;

20      C.    For prejudgment interest;

21      D.    For Ameris's attorneys' fees and costs incurred in connection with this

22          action;

23      E.    Permanent injunctive relief requiring Byrne and/or his agents, servants,

24          employees, and all persons acting under, in concert with, or for him to

25          account for any and all uses of Ameris's confidential, proprietary, trade

26          secret and/or attorney-client privileged information and communications,

27          including all use and disclosure thereof, including disclosing the identities of

28          all entities and individuals to which any disclosure was made;

---

F.  Permanent injunctive relief requiring Byrne and/or his agents, servants, employees, and all persons acting under, in concert with, or for him to return any of Ameris's confidential, proprietary, trade secret and/or privileged documents and/or communications in their possession, custody or control;

G.  Permanent injunctive relief prohibiting Byrne and/or his agents, servants, employees, and all persons acting under, in concert with, or for him from violating Byrne's confidentiality obligations to Ameris;

H.  Awarding such other and further relief as this Court deems just and proper.

Dated:  February 20, 2026         **NUKK-FREEMAN & CERRA**

By:

_/s/Stacy L. Fode_
Stacy L. Fode, Esq.
Nana J. Yee, Esq.
*Attorney for Plaintiff*
AMERIS BANK

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Ameris hereby demands a jury trial on all issues triable as of right to a jury.


Dated:  February 20, 2026          **NUKK-FREEMAN & CERRA**


                                          By:

                                                */s/Stacy L. Fode*
                                                Stacy L. Fode, Esq.
                                                Nana J. Yee, Esq.
                                                *Attorney for Plaintiff*
                                                AMERIS BANK