# Exhibit   A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(SOUTHERN DIVISION - SANTA ANA)

| | | |
|---|---|---|
| PATRICK BYRNE, | ) | CASE NO: 8:24-cv-01989-MWC-JDEx |
| | ) | |
| Plaintiff, | ) | CIVIL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| AMERIS BANK, | ) | Wednesday, June 3, 2026 |
| | ) | (8:57 a.m. to 11:59 a.m.) |
| Defendant. | ) | (1:03 p.m. to  4:36 p.m.) |

JURY TRIAL - DAY 2

BEFORE THE HONORABLE MICHELLE WILLIAMS COURT,
UNITED STATES DISTRICT JUDGE,
PRESIDING

APPEARANCES:               SEE PAGE 2

Court Reporter:            Recorded; CourtSmart

Courtroom Deputy:          T. Jackson

Transcribed by:            Exceptional Reporting Services, Inc.
                           20079 Stone Oak Pkwy.
                           Suite 1105, PMB 237
                           San Antonio, TX 78258
                           361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**Exhibit A**

2

<u>APPEARANCES:</u>

For Plaintiff:          MATTHEW THOMAS SESSIONS, ESQ.
                        ANDREW A. WOOD, ESQ.
                        MADISON LARSEN, ESQ.
                        Allen Matkins Leck Gamble Mallory
                        & Natsis
                        2010 Main Street
                        8th Floor
                        Irvine, CA 92614

                        STACEY ANN VILLAGOMEZ, ESQ.
                        Allen Matkins Leck Gamble Mallory
                        & Natsis
                        865 S. Figueroa Street
                        Suite 2800
                        Los Angeles, CA 90017


For Defendant:          STACY L. FODE, ESQ.
                        NANA JIN YEE, ESQ.
                        Nukk-Freeman & Cerra
                        550 West C Street
                        Suite 910
                        San Diego, CA 92101

**Exhibit A**

Byrne - Cross / By Ms. Fode                                165

MS. FODE:  Yeah.

BY MS. FODE:

Q    All right.  Have you seen this document before?

A    Yes.

Q    Okay.  Do you remember receiving it when you worked at Ameris Bank?

A    It was with a whole bunch of other stuff but, yes, I did receive it.

MS. FODE:  And if you'd go down to the last page.

Q    And do you remember acknowledging this on December 16th, 2021?

A    Not specifically but I'm sure that I did.

MS. FODE:  Okay.  I'd like to ask to admit and publish this document.

THE COURT:  Any objection?

MR. SESSIONS:  I just was wondering if Ms. Fode could be asked to lay a little more foundation to the relevance; otherwise no other objection.

THE COURT:  Okay.  So the objection is overruled. The Exhibit 325 is admitted and you may publish.

(Exhibit Number 325 received in evidence)

MS. FODE:  We're going to go to section four.

BY MS. FODE:

Q    All right.  So this is the Ameris Bank confidential information agreement.  And you just acknowledged that you

EXCEPTIONAL REPORTING SERVICES, INC

**Exhibit A**

Byrne - Cross / By Ms. Fode                              166

received it and acknowledged it, correct?

A    Yes.

Q    Okay.  I'd like to direct your attention to section four. And it states employee agrees that except as required in the course of his or her employment by Ameris Bank, employee will not duplicate, remove, transfer, disclose, or utilize or knowingly allow any other person to duplicate, remove, transfer, disclose, or utilize trade secret -- such trade secrets or confidential information.

Did I read that correctly?

A    You did.

Q    And does this provision state that you would not duplicate or transfer Ameris's confidential information and trade secrets?

A    Except as required in the course of my employment by Ameris Bank.

Q    And where does it say that, sir?

A    First sentence.  Employee agrees that except as required in the course of his or her employment by Ameris Bank.

Q    And we will talk about that in a moment.

A    Okay.

Q    Do you remember on section five here if we look about "C" to paragraph 5-C --

MS. FODE:  Highlight "C."  There we go.

THE WITNESS:  Could you move it up?  Thank you.

EXCEPTIONAL REPORTING SERVICES, INC

**Exhibit A**

Byrne - Cross / By Ms. Fode                                    167

MS. FODE:  Thank you.  Okay.

BY MS. FODE:

Q    Will you please read that into the record, sir?

A    The whole paragraph?

Q    Yes.  Thank you.

A    Okay.  Upon termination of employee's employment, whether voluntary or involuntary, or upon Ameris's Bank's request to deliver to Ameris Bank without copying or summarizing all written materials and all models, mechanisms, documents, records, and tangible things and the like containing or related to such confidential information, all of which shall be in and remain the sole property of Ameris Bank for this purpose.

Written material shall be deemed to include letters, memorandums, reports, notes, notebooks, books of account, data, drawings, prints, plans, specifications, formulas, and all other documents or writing, and all copies thereof.

Q    And does this state that your -- upon your termination, you would need to return copies of Ameris's confidential information?

A    It does.

MS. FODE:  And I'd like to ask for you to pull up three -- but don't publish Exhibit 326.

THE COURT:  Go ahead.

MS. FODE:  Okay.  Only for Mr. Byrne, yeah.  All right.

EXCEPTIONAL REPORTING SERVICES, INC

**Exhibit A**

Byrne - Cross / By Ms. Fode                                168

BY MS. FODE:

Q    Sir, have you seen this document before?

A    Is it the same one, acceptable use?

Q    It's a different document.  Have you seen it before?

A    Was the other one labeled acceptable use as well?

Q    It's -- actually the other one's a confidentiality --

A    Oh, apologies.

Q    Yeah.

A    Apologies, okay.

Q    But have you seen this one before?  And let us know if you need us to scroll down.

A    Yeah, if you would scroll down, that would be helpful.  Could you blow it up a little bit, too, so I could see it?

Q    Do you recall acknowledging -- receiving and acknowledging this document on December 16, 2021?

A    Not specifically.  But I don't dispute that I signed it.

        MS. FODE:  All right.  I'd like to ask to admit and publish the Exhibit 326.

        THE COURT:  Any objection?

        MR. SESSIONS:  No, Your Honor.

        THE COURT:  Okay.  Exhibit 326 is admitted and you may publish.

    (Exhibit Number 326 received in evidence)

        MS. FODE:  All right.

//

**Exhibit A**

Byrne - Cross / By Ms. Fode                    169

**BY MS. FODE:**

Q    You see that there, sir?

A    I do.

Q    Okay.  If you would please, I'd like to direct your attention to where it says, all users accessing.

**(Ms. Fode/Ms. Speaker confer.)**

Q    And do you --

THE COURT:  I'm sorry, is that part of the same exhibit?

MS. FODE:  Let me confer.

**(Ms. Fode/Ms. Speaker confer.)**

THE COURT:  I just took it off the jury screen because I don't think this is part of -- this isn't part of the document that we just admitted.

MS. FODE:  I think we need to -- okay, no worries.  Page 16.  All right.

**BY MS. FODE:**

Q    Overall the acceptable use policy prohibited you from sending customer information or email communications to third party email systems, correct?

A    I don't know.  Do you want -- it's a long document.  Do you want me to read the document or what would you suggest?

THE COURT:  And what is this document that's on his screen?

MS. FODE:  Technology is good until it doesn't work.

EXCEPTIONAL REPORTING SERVICES, INC

**Exhibit A**

Byrne - Cross / By Ms. Fode                                    170

Do you want to pull it up in your binder?

THE COURT:  No, we have it.  I just -- the document that was just admitted as Exhibit 326 was a two-page document that just had some information about what document he was accepting.

And then on the second page it was one line of an acceptance.  It didn't have the policy attached from what I could see.

MS. FODE:  Okay.  Yeah.  (Inaudible) attached policy, too.  Okay.  All right.

BY MS. FODE:

Q    So with regard to -- you understood as CEO of the Balboa Division that you had policies and procedures that prohibited you from disseminating confidential information, particularly customer and employee information.

MR. SESSIONS:  Objection, compound.

THE COURT:  Sustained.

MS. FODE:  What was the ruling, Your Honor?

THE COURT:  Sustained.

MS. FODE:  All right.

BY MS. FODE:

Q    As Balboa CEO, you understood that you were not allowed to disseminate customer information outside of the workplace, correct?

A    I was to keep Balboa information, yeah, care for Balboa

EXCEPTIONAL REPORTING SERVICES, INC

**Exhibit A**

Byrne - Cross / By Ms. Fode                               171

information and not have it get out to people that could use it for, you know, other purposes.

Q    Okay.  And you forwarded Ameris documents from your Ameris work email to your personal Yahoo email account while you were employed at Ameris, correct?

A    Yeah, I think it was common knowledge that I had that Yahoo account and that I did forward emails, specifically, you know, some of which were involved in this case.

Q    And you had testified that you sent yourself those emails to help assist with your lawsuit today, correct?

A    The answer was twofold.  That was number one.  Number two was to do my job and because the system was slow and that big spreadsheets, you know, you really couldn't work at them at work so I'd send them home and work on them.  So those were the two reasons that I sent documents to my Yahoo email address.

Q    And was there a policy or anything in writing that allowed you to do so?

A    Ross Creasy, yeah, let me know that I could do this.  And he was the -- he's the head IT person.  I guess we'll hear from him later.  But executive officer at Ameris.  And --

Q    And --

A    -- Jim LaHaise and everybody.  It was pretty much common knowledge that, right, that I would do this.

Q    And when did Mr. Ross Creasy allow you or provide you permission to send the documents to your personal Yahoo

EXCEPTIONAL REPORTING SERVICES, INC

**Exhibit A**

Byrne - Cross / By Ms. Fode                    172

account?

A     Probably in -- well, so when it was just I owned a hundred percent of Balboa so I had a lot of my personal information intertwined with Balboa.

And, you know, working on the acquisition and doing what was best for Ameris, I didn't really think about separating the two.  So when I sort of thought about it, they had all my information, you know, starting in right with the acquisition.

And so they had all my personal information, all the deal documents with, you know, concerning their deal, all the deal documents concerning everybody else's deal.

So I went to Ross and said, hey, can you please, you know, there's a tremendous amount of data here, can you just give me, right, permission to, right, to download these documents.

And he, you know, I mean, Jim knew this, everybody knew this.  But Ross, there's a -- you know, there's an email from Ross specifically saying that I can do this.  So this was 2022. This was, you know, whatever, four years ago.

Q     So your testimony is that Ross Creasy allowed you via email, he gave you permission to send your work documents to your Yahoo account.

A     Well, he knew that I had -- yeah, he knew that I had these -- right, he knew I had these documents, right.  Look, I -- yeah, I'm -- you know, I'm not going to do anything with these documents.  I know, yeah, and I think everybody says that

EXCEPTIONAL REPORTING SERVICES, INC

**Exhibit A**

Byrne - Cross / By Ms. Fode                                    173

I'm not doing anything with these documents.  But, yeah, --

Q    Do --

A    -- Ross Creasy, there was a few people that said that I could do this.  And it was pretty much common knowledge that I would send spreadsheets to my, yeah, to my house to work on.

Q    And just to clarify, you said that Ross Creasy sent you an email that gave you the authorization.

          MR. SESSIONS:  Your Honor, objection.  I think that misstates the testimony.

          THE COURT:  Sustained.

BY MS. FODE:

Q    Did Ross Creasy send you an email to allow you to send your work product to your personal Yahoo account?

A    There was a couple things.  I'd have to go back.  And, you know, obviously this was a long time ago, right.

     So specifically Ross was saying that I could have all the documents that were currently, right, on the system, right. And so that was, you know, that, you know, included PII and, you know, all the other stuff.

     Subsequent to that, right, we have in the 2023 strategic plan the -- were the biggest items that we have to fix in 2023, of which Jim approved, which was the speed of the system.

     So -- and the reason for the speed of the system is because everybody knows they work on a computer and it just spins, spins, spins, spins, spins, right.  You can't get any

**Exhibit A**

Creasy - Direct / By Ms. Yee                         237

DIRECT EXAMINATION

BY MS. YEE:

Q    Good afternoon, Mr. Creasy.  Can you please tell everyone here what's your current position at Ameris Bank?

A    I'm the chief information officer.

Q    And how long have you been working at Ameris Bank?

A    Almost eight years.

Q    And briefly what are your responsibilities as a chief information officer?

A    I'm responsible for technology, security, bank operations and fraud.

Q    Does Ameris have any policies governing employees' confidential company information?

A    We do.  We have a confidentiality agreement, acceptable use policy and employee handbook.

          MS. YEE:  Your Honor, permission to publish Exhibit 325.  This is an admitted exhibit.

          THE COURT:  Go ahead.

BY MS. YEE:

Q    Do you recognize this document?

A    I do.

Q    What is it?

A    It is our confidentiality agreement that every -- or that our employees sign, and you'll notice that there will be a name at the top which ties to the specific employee that

**Exhibit A**

Creasy - Direct / By Ms. Yee                            238

acknowledged the agreement.

Q    And who's that employee?

A    Patrick Byrne.

Q    And if you could please go to Section 4.  And this is on page Ameris 00018.  Can you briefly summarize what that section is about?

A    Section 4 is a summary for the employee.  Really it's about maintaining the confidentiality of our data and making sure that all of our data that's Ameris, whether it's confidential, proprietary, not to be duplicated, not to be transferred, essentially not to leave the bank and the network.

Q    Can you look at -- may I please direct your attention to paragraph 5(c) and let us know what that section is about.

A    To summarize this, this is about when an employee is terminated, whether it's voluntary or involuntary, they are required to bring everything back, as that is the sole property of the bank.  Whether that's written documents, electronic information that they might have, laptop, notebooks, account data, anything that's in their possession needs to be handed back.

Q    Mr. Creasy, I'd like to show you an exhibit that's marked 326 and this is -- I believe this exhibit is already admitted.

          THE COURT:  It is.

Q    What does acceptable use policy address?

A    The acceptable use policy addresses really for every

EXCEPTIONAL REPORTING SERVICES, INC

**Exhibit A**

Creasy - Direct / By Ms. Yee                                    239

teammate or every employee of the company to give them strict guidelines and rules they must follow around how to protect the -- protect the bank, protect our customers, protect our teammates in terms of data, but it also in there clearly explains things that you should not do, as well to help arm our employees of what they should and should not do in protecting our company assets.

Q    And I'd like to direct your attention to Ameris 000365, same document under the section inappropriate uses.

THE COURT:  Was this part of that exhibit?

MS. YEE:  Yes.  It's acknowledgement and the policy, it's one document, Your Honor.

THE COURT:  Okay.  Because when it was introduced I only saw the first two pages.

MS. YEE:  I see on my screen it's a document --

THE COURT:  I understand what's on the screen.  So from plaintiff's perspective does Exhibit 326 include the actual policy as well?

MR. WOOD:  That's our understanding, Your Honor.

THE COURT:  Okay.  Go ahead, Ms. Yee, my apologies.

BY MS. YEE:

Q    If I may please direct your attention to bullet point number 4.

A    Yeah.

Q    Starting with sending customer information.  Can you tell

EXCEPTIONAL REPORTING SERVICES, INC

**Exhibit A**

Creasy - Direct / By Ms. Yee                                    240

us briefly what that section is about?

A    Essentially the summary of this is, when sending customer information it needs to go in a secured encrypted way; i.e., regular mail to the person directly, not to a Gmail, not to a Yahoo account, those type of environments are not secure.  And that's for account numbers, passwords, documents, the customer information, employee information, all of that must be transported via secured means.

Q    And if we could please go to bullet point number 11 or the second to last one.

A    Yeah.

Q    Starting from sending or forwarding.

A    Yeah.

Q    What's that section about?

A    Essentially, you know, what this is saying it's just another example of what you should not do.  You should not be sending or forwarding e-mail communications to third party e-mail systems, very similar to what I mentioned above around Gmail accounts, Yahoo accounts, you should not be sending that to your, you know, personal e-mail.  You need to follow our acceptable use policy, as well as our security procedures around encryption.

        MS. YEE:  Your Honor, permission to publish Exhibit 319 that was admitted earlier.

        THE COURT:  Ms. Jackson, do you have that exhibit as

**Exhibit A**

Creasy - Direct / By Ms. Yee                          241

admitted?

THE CLERK:  One moment.  I do not.

THE COURT:  It's not admitted.

MS. YEE:  Apologize, it's a joint document, it's the employee handbook, Exhibit 319.

THE COURT:  Are you moving it into evidence?

MS. YEE:  Yes, defendant moves into evidence.

THE COURT:  Any objection?

MR. WOOD:  No, Your Honor.

THE COURT:  Okay.  Exhibit 319 is admitted and you may publish.

**(Exhibit Number 319 received in evidence)**

MS. YEE:  Thank you, Your Honor.

BY MS. YEE:

Q    May I please direct your attention to page 43 and Section 5-18.  And what is that section about?

A    What?

Q    Under company property.

A    Yeah.  What this summarizes is, you know, at separation from the company all employees must return all company information assets back to the company, whether it's in hard copy form, whether that's a credit -- a corporate credit card, a key fob to get into a building, laptop, manuals, electronic -- any -- your laptop, anything that you have in your possession that's company information, confidential information must be

**Exhibit A**

Creasy - Direct / By Ms. Yee                    242

returned back to the bank as that is our property.

Q    Mr. Creasy, why does Ameris have these policies that we just discussed?

A    You know, like we're a financial institution we're regulated, you know, our job is to make sure we protect our customers.  They get loans from us, they keep their deposits with us, they provide a lot of personal information that we are required to maintain and we need to make sure that things are secured and protected on behalf of all of our customers, as well as our teammates.  We take a lot of information on our teammates to make sure they are in good standing, that they can do the transactions and the work that we need them to do at the bank.

And so this is absolutely critical for us to maintain security but also protect our customer's information, our teammate's information as well as our corporate asset strategy, business document procedures, things that we -- some basis we would call your secret sauce, you know, what makes you great.

Q    And following Mr. Byrne's termination, did you learn any conduct of Mr. Byrne that relates to these policies?

          MR. WOOD:  Objection, lacks foundation.

          THE COURT:  Sustained.

BY MS. YEE:

Q    When did you first learn about a violation of this policy by any employees in this case?

**Exhibit A**

Creasy - Direct / By Ms. Yee                                    243

MR. WOOD:  Objection, vague, compound, overbroad and lacks foundation.

THE COURT:  Sustained.

Q    What happens if confidential information was sent to employee's Yahoo or Gmail or other unsecured personal accounts?

MR. WOOD:  Objection, vague.

THE COURT:  Sustained.

Q    As we discussed earlier, what's the consequence of a violation of these policies?

MR. WOOD:  Objection, vague, misstates prior testimony.

THE COURT:  Sustained.

BY MS. YEE:

Q    Are you aware that Mr. Byrne has ever violated any policies of Ameris Bank?

MR. WOOD:  Objection, leading, vague and lacks foundation.

THE COURT:  Sustained.

BY MS. YEE:

Q    Did Ameris learn of any conduct by Mr. Byrne that's in connection with these policies?

MR. WOOD:  Objection, lacks foundation and vague and leading.

THE COURT:  Sustained.

//

EXCEPTIONAL REPORTING SERVICES, INC

**Exhibit A**

Creasy - Direct / By Ms. Yee                                    244

BY MS. YEE:

Q    Mr. Creasy, you are the chief information officer and if any potential violation or violation of the policy occurred, you will be informed, correct?

        MR. WOOD:  Objection, leading.

        THE COURT:  Sustained.

BY MS. YEE:

Q    Mr. Byrne testified earlier that you authorized him to send work e-mails to his personal e-mail account.

        MR. WOOD:  Objection, misstates prior testimony, violates the exclusion of witnesses, lacks foundation.

        THE COURT:  The objection is sustained.  It's also not a question.  Do you have a question for him?

BY MS. YEE:

Q    Did Mr. Byrne ever ask you for permission to send company documents and information to his e-mail, personal e-mail address?

A    No.

Q    He never did?

A    No.

        MR. WOOD:  Objection, leading, move to strike.

        THE COURT:  Sustained, the motion is granted.

BY MS. YEE:

Q    What did he ask you during the course of his employment regarding forwarding e-mails to his personal e-mail address?

EXCEPTIONAL REPORTING SERVICES, INC

**Exhibit A**

Creasy - Direct / By Ms. Yee                          245

MR. WOOD:  Objection, vague and overbroad?

THE COURT:  Sustained.

BY MS. YEE:

Q    Did Mr. Byrne ever tell you that he intend to forward documents to his personal e-mail address?

A    No, he did not.  We have a policy that all employees must follow around the acceptable use policy.  So even if that was asked, we would never authorize something like that.

Q    Did Mr. Byrne ever report to you or your team that he was experiencing system performance problems that required him to use his personal e-mail?

MR. WOOD:  Objection, compound.

THE COURT:  Sustained.

BY MS. YEE:

Q    Did Mr. Byrne ever report to you that he was experiencing system performance problems?

A    We always have system issues in the world of technology, no system works perfectly.  We definitely had system issues with the Balboa platform.  With respect to our e-mail platform, there was no performance issues with our e-mail platform, but across our entire company, even specifically in Balboa, we had system issues.  Some of the issues were latency and getting information out of the system prior to the deal, it took two seconds.  After the deal, some things took 8, 9 seconds in terms of getting information out of the Balboa portal 360

EXCEPTIONAL REPORTING SERVICES, INC

**Exhibit A**

Creasy - Direct / By Ms. Yee                                    246

platform, but not our e-mail platform.

Q    And as the chief information officer, are employees prohibited from sending information, confidential company information to their personal e-mail?

        MR. WOOD:  Objection, vague, asked and answered and leading.

        THE COURT:  Sustained.

BY MS. YEE:

Q    Have any other employees at Ameris been terminated for sending company documents to their e-mail address, based on your personal knowledge?

A    Yes, they have.

Q    Can you give us an example?

A    Yes, we had an employee sending client information to their personal e-mail.  That person was terminated, but also had to sign a document acknowledging that they deleted all of that data from their personal e-mail account and wherever they stored it in that personal environment and that person was terminated.

Q    As part of the termination, were there any other specific requirements that employee must comply?

        MR. WOOD:  Objection, leading.

        THE COURT:  Sustained.

//

//

**Exhibit A**

Creasy - Direct / By Ms. Yee                                    247

BY MS. YEE:

Q    Can you give any other examples regarding employees that violated the policies?

A    Yes, we had another employee who took a complete folder and sent that to themselves to their personal account.  We also terminated that employee as well for sending confidential information to their personal account.

Q    And in both of those cases, as you testified earlier, the consequence was termination, correct?

A    Yes.

        MR. WOOD:  Objection, leading and move to strike.

        THE COURT:  Sustained and the motion to strike is granted and the witness' last answer is to be disregarded by the jury.

BY MS. YEE:

Q    In both of those cases -- those examples you just gave, what was the consequence?

        MR. WOOD:  Objection, asked and answered.

        THE COURT:  Sustained.

BY MS. YEE:

Q    And aside from -- strike that.

    When did -- we just reviewed the policy regarding returning company property under the employee handbook, what happens if an employee does not return their laptop or other accessories at the time of separation from Ameris?

EXCEPTIONAL REPORTING SERVICES, INC

**Exhibit A**

Creasy - Direct / By Ms. Yee                              248

MR. WOOD:  Objection, vague, lacks foundation and I believe this is a similar question that was previously sustained.

THE COURT:  Sustained.

BY MS. YEE:

Q    Do you have any personal knowledge that Mr. Byrne never returned his company issued laptop?

MR. WOOD:  Objection, leading and lacks foundation.

THE COURT:  Sustained.

BY MS. YEE:

Q    Did Mr. Byrne return or did not return his personal -- his company issued laptop to Ameris after his termination?

MR. WOOD:  Yeah, same objections.

THE COURT:  Sustained.

BY MS. YEE:

Q    Mr. Creasy, can you tell us your working relationship with Mr. Byrne during his employment at Ameris?

MR. WOOD:  Objection, relevance, vague and lacks foundation.

THE COURT:  Sustained.

BY MS. YEE:

Q    In your personal -- based on your personal knowledge did Mr. Byrne violate any company policies?

MR. WOOD:  Objection, lacks foundation, leading, calls for speculation and compound, vague and sorry, I believe

EXCEPTIONAL REPORTING SERVICES, INC

**Exhibit A**

Creasy - Direct / By Ms. Yee                                  249

it calls for an expert opinion.

THE COURT:  Sustained.

**BY MS. YEE:**

Q   How did you first -- did you ever learn of Mr. Byrne's -- any conduct of Mr. Byrne after separation?

MR. WOOD:  Objection, vague and lacks foundation.

THE COURT:  Sustained.  I don't understand that question at all.

MS. YEE:  Sorry, Your Honor.

Q   Did Mr. Byrne ever forward confidential information to his personal e-mail address?

MR. WOOD:  Objection, lacks foundation.

THE COURT:  Sustained.

Q   Based on your personal knowledge and during the employment of Mr. Byrne.

MR. WOOD:  Objection, lacks foundation.

THE COURT:  Sustained.

**(Pause)**

THE COURT:  Ms. Yee, do you have any other questions for this witness?

MS. YEE:  That's all, Your Honor.

THE COURT:  Okay.  Cross-examination?

MR. WOOD:  Yes, very briefly, Your Honor.

//

//

**EXCEPTIONAL REPORTING SERVICES, INC**

**Exhibit A**

261

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                          June 4, 2026

            Signed                                          Dated


                    *TONI HUDSON, TRANSCRIBER*

**Exhibit A**