REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

# EXHIBIT A

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Kirsten McCaw Grossman
kgrossman@nfclegal.com
*Pro hac vice Admitted*
Moira Heiges-Goepfert (SBN 326861)
mgoepfert@nfclegal.com
Stacy L. Fode, Esq. (SBN 199883)
sfode@nfclegal.com
**NUKK-FREEMAN & CERRA, P.C.**
550 West C Street, Suite 910
San Diego, California 92101
Telephone: 619.292.0515
Facsimile:  619.566.4741

*Attorneys for Plaintiff*
AMERIS BANK

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERIS BANK, a Georgia corporation,<br><br>Plaintiff,<br><br>vs.<br><br>PATRICK BYRNE, an individual,<br><br>Defendant. | Case No. 8:26-cv-00393-MWC-JDE<br><br>**AMERIS BANK'S AMENDED COMPLAINT AGAINST PATRICK BYRNE FOR:**<br><br>1) **BREACH OF CONTRACT;**<br>2) **TRADE SECRET MISAPPROPRIATION IN VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1832 et seq.**<br>3) **TRADE SECRET MISAPPROPRIATION IN VIOLATION OF CAL. CIV. CODE §§ 3426 et seq. ("CUTSA")**<br>4) **VIOLATION OF CALIFORNIA PENAL CODE § 502**<br>5) **CONVERSION**<br><br>**JURY TRIAL DEMANDED** |

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

Plaintiff AMERIS BANK ("Ameris" or "Plaintiff") brings this action against Defendant PATRICK BYRNE ("Byrne" or "Defendant") and alleges as follows:

### INTRODUCTION

1.      Ameris brings this lawsuit to protect the confidential, proprietary and trade secret information belonging to Ameris, its customers, and its employees.  Byrne is a former employee of Ameris and was formerly employed as CEO of Ameris's Balboa Division ("Balboa"), which Byrne previously owned and sold to Ameris in December 2021 for approximately *$187 Million Dollars*. Following the sale, Ameris hired Byrne pursuant to an Employment Agreement and an extremely lucrative incentive compensation package that paid Byrne millions more in compensation during the two and a half years he was employed by Ameris.

2.      Following the purchase of Balboa by Ameris and in accordance with the terms of his Employment Agreement, Byrne was subject to the policies and procedures of Ameris. This included those specifically designed to maintain the secrecy of confidential, proprietary and trade secret information held by Ameris and to which certain Ameris employees, like Byrne, had access.

3.      Unbeknownst to Ameris at the time, Byrne did not comply with his contractual duties to maintain the secrecy of the confidential, proprietary and trade secret information to which he had access as an Ameris employee. Instead, on numerous occasions, and to an increasing degree in the time period immediately preceding his termination from Ameris, Byrne sent *hundreds* of Ameris documents consisting of *thousands* of pages of confidential, proprietary and trade secret information belonging to Ameris from his Ameris e-mail account to his personal, *unencrypted* e-mail account in blatant disregard of Ameris policy. The information contained in the documents included everything from personally identifiable information ("PII") regarding Ameris employees and customers, attorney-client privileged communications between Ameris and its attorneys, documents protected under the Bank Examination Privilege, detailed and commercially sensitive trade secret information relating to Ameris customers and their

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

loans (including customers' names, dates of birth, credit scores, and social security numbers), and other detailed proprietary and trade secret information relating to Ameris, its business operations and finances.

4.      Byrne's unauthorized transfers created separate copies of Ameris's documents and data outside Ameris's network system and gave Byrne personal control, and power of disposal that he did not possess and was not entitled to merely by being an Ameris employee.

5.      Byrne's actions were not authorized by Ameris, and were not necessary for the performance of his job; instead Byrne engaged in these actions for his own personal benefit, including in advancing his litigation position and personal business interests.

6.      Byrne's access to Ameris's computer networks and software, his Ameris-issued laptop and his Ameris email account during the course of his employment never gave him ownership of Ameris documents and data, or permission to transmit, copy, retain or use Ameris information through his personal email account, personal laptop computers, or any other personal cloud storage or account. Instead, Ameris at all times retained ownership and the right to control, restrict, revoke, preserve, and delete copies maintained within its systems, and its policies strictly forbade transmitting, copying, retaining or using information outside of Ameris-approved networks and devices.

7.      Byrne knew that his transmission, copying, retention and use of Ameris's documents and data violated his contractual agreements and Ameris policies.  Accordingly, Byrne has repeatedly attempted to control, conceal, and minimize his misappropriation of Ameris's confidential, proprietary and trade secret information, including by withholding evidence of his misappropriation in his prior lawsuit against Ameris, choosing when and how to disclose misappropriated documents to others, and repeatedly refusing to return the wrongfully acquired documents.

8.      Upon discovering Byrne's misappropriation in September 2025, and on numerous occasions thereafter, Ameris demanded the return and destruction of the confidential, proprietary and trade secret information Byrne took from Ameris. Byrne has

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

repeatedly and categorically refused. Even after testifying at trial in his prior lawsuit against Ameris that he *didn't want* Ameris's documents and was "*absolutely*" willing to return them, *Byrne has continued to double down on his refusal to return and destroy the information he took from Ameris,* without explanation or justification. Compounding this misconduct, Byrne also refused to return his Ameris laptop after his termination. Upon information and belief, Byrne knew that doing so would have expedited Ameris's discovery of his theft.

9. While Ameris's investigation is ongoing, the information Ameris has uncovered to date demonstrates that Byrne breached his contractual obligations to Ameris and misappropriated documents containing confidential, proprietary and trade secret information belonging to Ameris. Byrne's conduct and continued possession of these documents was and is deliberate, unlawful, and poses the very real risk of a data breach. Therefore, in addition to damages, Ameris seeks a permanent injunction requiring Byrne to return the documents he stole from Ameris without retaining any copies or forensic artifacts or other data from which the documents or information therein can be recreated. Ameris also requests injunctive relief requiring the immediate return of the Ameris laptop Byrne used while employed.

## PARTIES

10. Ameris is a Georgia corporation with its principal place of business in Atlanta, Georgia.

11. Byrne is an individual who, upon information and belief, resides in Orange County, California.

## JURISDICTION AND VENUE

12. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different States and the amount in controversy exceeds $75,000.00, excluding interest and costs. Ameris alleges, inter alia, that Byrne has misappropriated and retained hundreds of Ameris documents containing thousands of pages of Ameris's confidential, proprietary and trade secret information, in

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

violation of his contractual agreements with Ameris, federal, state and common law. This conduct has caused substantial damage to Ameris, including causing Ameris to expend well over $75,000.00 to investigate the extent of Byrne's misappropriation and attempt to recover and remediate its property and information.

13. Additionally, Ameris's Second Claim for Relief arises under the Defend Trade Secrets Act, 18 U.S.C. § 1832 *et seq*. Therefore, this Court has original subject matter jurisdiction over this claim pursuant to 28 U.S.C. § 1331 *et seq*.

14. The First, Third, Fourth and Fifth Claims for Relief arise under California statutory and common law. This Court has concurrent subject matter jurisdiction over these Claims for Relief on the basis of supplemental jurisdiction under 28 U.S.C. § 1367(a), because: (a) the federal and state law claims asserted herein are based, in part, upon the same operative facts; (b) the Court's exercise of jurisdiction over the pendent state law claims will promote judicial economy, convenience, and fairness to the parties; and (c) such claims are so related to the Second Claim for Relief that they form part of the same case or controversy under Article III of the United States Constitution.

15. Personal jurisdiction is proper in the Central District of California because Byrne resides in this District and has maintained sufficient minimum contacts with this District at all relevant times herein.

16. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b)(2) because Byrne is domiciled and worked in this District at all relevant times herein, and a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## GENERAL ALLEGATIONS

### The Sale of Balboa to Ameris and Byrne's Employment with Ameris

17. Ameris opened its doors as American Banking Company on October 1, 1971. What started as one location in Moultrie, Georgia and $1 million in capital has evolved into a publicly traded bank headquartered in Atlanta, Georgia.

18. As a state-chartered commercial bank, Ameris is regulated and insured by the

---

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

Federal Deposit Insurance Corporation ("FDIC").

19.    Prior to December 10, 2021, Balboa Capital Corporation ("Balboa") was an online provider of business lending solutions to small and mid-sized businesses nationwide for the purchase or lease of equipment.

20.    Balboa was headquartered in Costa Mesa, California.

21.    Defendant Byrne was the co-founder of Balboa and, through his trusts, was the sole owner of Balboa on December 10, 2021.

22.    Defendant Byrne was also the Chief Executive Officer of Balboa.

23.    On December 10, 2021, Byrne, Balboa and Ameris entered into a Stock Purchase Agreement pursuant to which Ameris acquired Balboa. Balboa became a division of Ameris.

24.    In connection with the sale of Balboa to Ameris, Byrne was hired as an employee by Ameris, with the title of CEO of the Balboa division.

25.    Byrne's employment with Ameris was governed by an Employment Agreement dated December 10, 2021 ("Employment Agreement"). The Employment Agreement was for a term of just over three years, ending on December 31, 2024, with the option to renew.

26.    After the acquisition, Byrne became an employee of Ameris, who was subject to Ameris's policies and who was not granted any permission or rights to misuse Ameris's computer systems or misappropriate Ameris's documents.

**Byrne's Access to Ameris's Confidential, Proprietary and Trade Secret Information**

27.    The banking and financial services industry is highly regulated and subject to a multitude of statutes, regulations, guidances and orders. The industry is also subject, without limitation, to the provisions of Title V, Subtitle A of the Gramm-Leach-Bliley Act ("GLBA"), Financial Services Modernization Act of 1999, 15 U.S.C. § 6901 *et seq.*, which governs the treatment of nonpublic personal information by financial institutions. GLBA authorized the federal financial institution regulatory agencies to adopt regulations to implement those provisions and the pre-existing provisions of the Fair Credit Reporting

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

Act. Under GLBA, and its implementing regulations, including 12 CFR Part 1016 *et seq.*, Privacy of Consumer Financial Information (Regulation P), a financial institution is prohibited from disclosing nonpublic personal information to nonaffiliated third parties, unless the institution satisfies various notice and opt-out requirements.

28.     The industry is further subject to additional consumer privacy laws and regulations under state law, including those protecting consumers' employment-related personal data and requiring consumer privacy disclosures, such as the California Consumer Privacy Act, California Civil Code §§1798.100-199 and its implementing regulations at 11 California Code of Regulations §§ 7000 *et seq.* ("CCPA").

29.     As a FDIC-supervised financial institution, Ameris is subject to federal regulations governing Confidential Supervisory Information, including 12 C.F.R. Part 309, under which confidential supervisory materials generally may not be disclosed without FDIC authorization because they are considered the property of the FDIC rather than the supervised institution. Federal law also recognizes the qualified Bank Examination Privilege, which protects the deliberative communications and opinions exchanged between banking regulators and regulated financial institutions from disclosure except in limited circumstances.

30.     In his role as the CEO of Balboa, Byrne had access to large amounts of highly valuable confidential, proprietary and trade secret information belonging to Ameris, including "Confidential Information"[1] as defined in Byrne's Confidential Information

---

[1] The Confidential Information Agreement that Byrne entered into with Ameris governs Byrne's handling of trade secrets and other "Confidential Information," which the Agreement defines to include:

> Ameris Bank's customer, supplier and employee information; including, but not limited to, contractual agreements with customers, lists of past, present, or prospective customers, customer sales summaries, customer files or customer-related correspondence, customer lists, customer requirements and other customer data not generally available to the public, as well as customer information within the scope of the [GLBA], Financial Services Modernization Act of 1999, 15 U.S.C. Section 6801 *et. seq.*; Ameris Bank's financial and marketing information and

---

*AMERIS BANK v. PATRICK BYRNE*                    Case No.  8:26-cv-00393-MWC-JDE
AMENDED COMPLAINT                                                        Page 6

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Agreement with Ameris. This information included, but was not limited to, contractual agreements with Ameris customers; lists of past, present and prospective customers, customer files and/or customer correspondence, customer requirements and other customer data not generally available to the public, including customer information within the scope of the GLBA; Ameris financial and marketing information and projections, including, but not limited to, market surveys, marketing objectives and marketing strategies; Ameris products and services and pricing for same, information about costs, profits, sales and markets, Ameris internal legal metrics; and Ameris business methods and procedures, including, but not limited to, Ameris operations and/or processes.

31.     Byrne also had access to substantial amounts of Confidential Information relating to Ameris employees in the Balboa division, including, but not limited to, contact information, information regarding wages, bonuses, incentives and tax withholding, 401(k) and Roth IRA contributions, insurance information, and information regarding employee leaves of absence and paid time off.

32.     Ameris is highly protective of its confidential, proprietary and trade secret information and goes to great lengths to protect it from unauthorized use or disclosure.

33.     Ameris invests millions of dollars every year in the systems, processes and employee training necessary to generate and secure the confidential, proprietary and trade secret information to which Byrne had access.

projections, including but not limited to, market surveys, marketing objectives, and marketing strategies; Ameris Bank's products and services and the pricing for same, including, but not limited to, price books or other pricing information, and other information about costs, profits, sales, and markets; Ameris Bank's business methods and procedures, including, but not limited to, Ameris Bank's operations and/or processes and formulas, plans, drawings, flow charts, ratios, secret processes or machines, inventions, designs, drawings, blueprints, software, concepts, prototypes, techniques, procedures, systems, methods, studies, research projects, new product development plans, software, databases or other technology created, developed or compiled by Ameris Bank; hardware and software configurations developed by Ameris Bank; and other commercially sensitive information the secrecy of which is valued by Ameris Bank.

*AMERIS BANK v. PATRICK BYRNE*                    Case No.  8:26-cv-00393-MWC-JDE
AMENDED COMPLAINT                                                              Page 7

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

34.    Much of the information to which Byrne had access, in particular information relating to Ameris's employees and customers, would be highly valuable to a competitor. Some of the information, including the Ameris employee and customer PII, would be valuable to bad actors who could potentially misuse the information in connection with criminal conduct.

**Byrne's Contractual Obligations to Safeguard Ameris's Confidential, Proprietary and Trade Secret Information**

35.    Ameris's efforts to protect its confidential, proprietary and trade secret information from disclosure includes requiring its employees to enter into various agreements requiring employees to maintain the confidentiality of Ameris information and comply with Ameris policies designed to protect it.

36.    During and as a condition of his employment, Byrne was required to annually acknowledge and to comply with Ameris policies and procedures. Byrne also specifically acknowledged the confidentiality of Ameris's proprietary and trade secret information annually.

37.    For example, in connection with his employment with Ameris, Byrne electronically signed Ameris's Confidential Information Agreement ("CI Agreement"), which states that "except as required in the course of his/her employment by Ameris Bank, [Byrne] will not duplicate, remove, transfer, disclose or utilize, nor knowingly allow any other person to duplicate, remove, transfer, disclose or utilize" Ameris Confidential Information and/or trade secrets.

38.    The CI Agreement also required Byrne "to hold all such Confidential Information in strict confidence, and not publish or otherwise disclose any portion thereof during [Byrne's] employment and for a two (2) year period after termination except with prior written consent of the President of Ameris Bank."

39.    The CI Agreement also required Byrne to "make no use of any such Confidential Information except such use as is required in the performance of [Byrne's] duties for Ameris Bank or with prior written consent of the President of Ameris Bank."

---

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

40.     The CI Agreement required Byrne, upon termination of his employment, "to deliver to Ameris Bank, without copying or summarizing, all written materials and all models, mechanisms, documents, records, and tangible things and the like containing or relating to such Confidential Information, all of which shall be and remain the sole property of Ameris Bank. For this purpose, 'written materials' shall be deemed to include letters, memoranda, reports, notes, notebooks, books of account, data, drawings, prints, plans, specifications, formulas and all other documents or writings, and all copies thereof."

41.     Finally, the CI Agreement contained the following provision relating to Trade Secrets:

"With respect to any Trade Secrets, whatever their nature and form and whether obtained orally, by observation, from written materials or otherwise during or as the result of [Byrne's] employment by Ameris Bank, [Byrne] agrees:

    a.  To hold all such Trade Secrets except such use as is required in the performance of [Byrne's] duties for Ameris Bank or with prior written consent of the President of Ameris Bank;

    b.  To make no use of any such Trade Secrets except such use as is required in the performance of [Byrne's] duties for Ameris Bank or with prior written consent of the President of Ameris Bank;

    c.  Upon termination of [Byrne's] employment, whether voluntary or involuntary, or upon Ameris Bank's request, to deliver to Ameris Bank, without copying or summarizing, all written materials and all models, mechanisms, documents, records, and tangible things and the like containing or relating to such Trade Secrets, all of which shall be and remain the sole property of Ameris Bank. For this purpose, 'written materials' shall be deemed to include letters, memoranda, reports, notes, notebooks, books of account, data, drawings, prints, plans, specifications, formulas and all other documents or writings, and all copies thereof."

*AMERIS BANK v. PATRICK BYRNE*                                    Case No.  8:26-cv-00393-MWC-JDE
AMENDED COMPLAINT                                                                      Page 9

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

42.     Given that any breach of the CI Agreement will cause irreparable harm to Ameris, the CI Agreement further provides that, in the event that Ameris is required to bring an action to enforce its rights under the CI Agreement, Ameris will be entitled to recover its attorney's fees, costs, and expenses, in addition to all damages and other remedies.

43.     In connection with his employment with Ameris, Byrne also electronically signed Ameris's Acceptable Use Policy, which establishes permitted and prohibited uses of Ameris's computer systems, networks, mobile devices, removeable media, internet, voice systems, and e-mail communications.

44.     Ameris implemented the Acceptable Use Policy in large part to maintain the secrecy and integrity of its confidential, proprietary, and trade secret information and accordingly imposed a duty on Byrne (and all employees) to safeguard this information. The policy states: "You, as an employee of Ameris Bank, are given access to private customer data and proprietary company information through the bank's network. *It is your duty under law to safeguard this information,* to ensure its accuracy *and protect its privacy.* It is likewise the bank's duty under law to ensure that its employees honor their legal obligations" (emphasis added).

45.     The Acceptable Use requires employees, including Byren, to "[u]se *extreme caution* when communicating confidential or sensitive information via email" and to "Keep in mind that *all email messages sent outside of Ameris Bank become the property of the receiver*."

46.     The Acceptable Use Policy contains numerous requirements designed to safeguard Ameris and customer information from improper disclosure by employees, and otherwise maintain the secrecy of Ameris's confidential, proprietary and trade secret information, including, but not limited to, the following:

a.  Locking computers when left unattended;

b.  Logging off when leaving the bank;

c.  Immediate reporting if Ameris equipment is lost or stolen;

---

*AMERIS BANK v. PATRICK BYRNE*                    Case No.  8:26-cv-00393-MWC-JDE
AMENDED COMPLAINT                                                    Page 10

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

d. Changing passwords if an employee knows or suspects it is no longer secure;

e. Changing passwords that meet or exceed network requirements;

f. Changing passwords when required by established parameters for password age; and

g. Prohibiting the use of portable storage devices and drives including thumb drives.

47. The Acceptable Use Policy also expressly prohibits employees from:

a. "Send[ing] customer information, such as account numbers, passwords, etc., by unencrypted email";

b. "Accessing personal email or alternate email accounts, such as Gmail, Hotmail, Yahoo, etc.";

c. "Connecting non-approved computing or computing devices [including personal computers] to the Ameris network . . . unless specifically authorized by the Information Technology Department . . . . Only approved devices which are issued and documented by the Information Technology Department may be used to connect to the Ameris Bank network.";

d. "Us[ing] email in any way that violates Ameris Bank's policies, rules, or administrative orders, including, but not limited to items not specifically listed;

e. "[U]s[ing] company equipment or other resources for any purpose other than that authorized by the Chief Innovation Officer or his designee."

f. "Viewing, copying, altering, or deletion of . . . files belonging to Ameris Bank or another individual without authorized permission"; and

g. "Sending or forwarding email communications to third party email systems with the intent of circumnavigating Ameris Bank Email Acceptable Use Policy, Acceptable Use Policy, Information Security Policy or security procedures."

48. Ameris also requires employees to immediately report any information breach under the Acceptable Use Policy, including, any communication that:

a. "Contains attachment(s) which have information that can be classified as [PII], i.e. tax records, client records, financial statements, SSN, credit information, etc.

---

*AMERIS BANK v. PATRICK BYRNE*    Case No.  8:26-cv-00393-MWC-JDE
AMENDED COMPLAINT    Page 11

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

b. Contains information that would be considered intellectual property of Ameris Bank.

c. Contains information that could negatively impact Ameris Bank's results or operations if exposed to competitors or other entities.

d. Contains language or information that could expose Ameris Bank to litigation.

e. Contains information not specifically listed here but which poses a risk to Ameris Bank."

49. The Acceptable Use Policy also prohibited Byrne from revealing or publicizing confidential or proprietary information, including financial information, confidential client information, marketing strategies and plans, databases and information contained therein, client lists, computer software source codes, computer/network access codes, and business relationships.

50. The Acceptable Use Policy provides that employees who violate its guidelines may be subject to disciplinary action, including written warnings, revocation of access privileges, and termination.

51. At all times during Byrne's employment, Ameris also maintained a Code of Business Conduct and Ethics ("Code of Conduct"), which Byrne acknowledged and was required to follow.

52. Paragraph 6 of the Code of Conduct prohibits employees, including Byrne from "taking for themselves personal opportunities that are discovered through the use of corporate property, information or position without the consent of the Board of Directors" and further states that "No employee, officer or director may use corporate property, information, or position for improper personal gain."

53. Paragraph 11 of the Code of Conduct provides:

"Employees, officers and directors must maintain the confidentiality of confidential information entrusted to them by the Company or its customers, suppliers or partners, except when disclosure is authorized by appropriate personnel or the Board of Directors or required by laws or regulations. Confidential Information includes

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

all non-public information that might be of use to competitors, or harmful to the Company or its customers, suppliers or partners, if disclosed. The obligation to preserve confidential information continues even after employment or service as a director ends."

54.     Paragraph 12 of the Code of Conduct requires employees to "endeavor to protect the Company's assets." Paragraph 12 further states that "[t]he obligation of employees, officers and directors to protect the Company's assets includes its proprietary information", which is defined to include the following:

"intellectual property such as trade secrets, patents, trademarks and copyrights, as well as business, marketing and service plans, engineering and manufacturing ideas, designs, databases, records, salary information and any unpublished financial data and reports."

55.     In exchange for his agreement to comply with Ameris policies requiring the safeguarding of confidential, proprietary and trade secret information, Byrne received $187 Million Dollars in connection with the sale of Balboa, and millions more in employment compensation over the next two and a half years of his employment.

56.     At no point did Byrne receive permission or consent from Ameris's President or Chief Information Officer (or their appointed designees) to violate or bypass these important policies and agreements. Specifically, Byrne was never authorized to use his personal laptop for Ameris work, to send Ameris information and documents (including confidential, proprietary and trade secret information) to his personal email address, to copy and keep Ameris's confidential, proprietary and trade secret information on personal devices, private email accounts or other online accounts, to use such information and documents for his own personal benefit in litigation or business endeavors beyond the scope of his Ameris employment, or to personally retain such information and documents for his own use after termination.

///

///

---

*AMERIS BANK v. PATRICK BYRNE*          Case No.  8:26-cv-00393-MWC-JDE
AMENDED COMPLAINT                        Page 13

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

## <u>Other Measures Taken by Ameris to Protect Its Confidential, Proprietary and Trade Secret Information</u>

57. In addition to requiring its employees with access to confidential, proprietary and trade secret information to execute confidentiality agreements, Ameris takes numerous other measures to protect its confidential, proprietary and trade secret information from disclosure.

58. At all times throughout the relevant period, Ameris has maintained, and continues to maintain, robust information security and privacy policies to protect consumer and employee data as well as other types of confidential and proprietary business information in accordance with applicable law and industry best practices. These policies and practices include, inter alia, adhering to or surpassing industry standards for cyber security, data encryption and network security; conducting regular risk assessments and external audits; designating personnel responsible for enforcing the security of physical and electronic information platforms and appropriately classifying, and limiting access to, confidential and proprietary information.

59. For example, Ameris's Information Technology Department maintains an inventory of all approved electronic devices by type and serial number. Only devices specifically approved by the Information Technology Department may be connected to the Ameris computer network, and any device used to transfer or transport data must use 256-bit Advanced Encryption Standard (AES) hardware-based encryption.

60. In addition, all employees of Ameris, including Byrne, are required to undergo training upon commencement of employment by Ameris and annually thereafter. Among other subjects, the training provided to employees reviews Ameris's confidentiality and data security policies and procedures as well as the requirements of applicable law.

61. Ameris policy, as repeatedly emphasized to Byrne during Ameris's employee training, prohibited him from taking and obtaining personal possession of any Confidential Information outside Ameris's physical locations, except on Ameris issued and owned computer devices, systems, servers, or networks, and then only in accordance with his

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

specific job requirements. Byrne neither requested nor received any waiver of or exceptions to this policy.

62. Even with respect to the confidential, proprietary and trade secret information made available to Byrne as the CEO of Balboa, Byrne never requested, and Ameris never gave Byrne, consent, permission, approval or authorization to retain such information for any purpose.

63. During his employment with Ameris, Byrne understood that he was required to maintain Ameris's confidential, proprietary and trade secret information in strict confidence.

**Ameris Discovers That Byrne Violated His Obligations to Maintain the Secrecy and Security of Confidential, Proprietary and Trade Secret Information During the Course of his Wrongful Termination Lawsuit**

64. Ameris terminated Byrne's employment on or about June 27, 2024.

65. On or about September 16, 2024, Byrne filed a lawsuit against Ameris in the United States District Court for the Central District of California, Southern Division. Byrne's lawsuit alleged wrongful termination in violation of California public policy, retaliation in violation of California Labor Code, failure to pay wages due at termination and unfair competition in violation of California law.

66. The thrust of Byrne's lawsuit was that Ameris terminated him due to his complaints about the calculation of his Long-Term Incentive Plan ("LTIP") compensation. Byrne claimed that Ameris did not calculate his LTIP compensation properly and owes him additional compensation. Ameris denied Byrne's claims.

67. In or about September 2025, Ameris commenced review of ESI in connection with Byrne's lawsuit against Ameris, including the contents of Byrne's Ameris e-mail account.

68. Ameris's investigation, which is still ongoing, has revealed that on numerous dates throughout his employment, Byrne sent many e-mails from his Ameris e-mail account to his personal e-mail account. The e-mails Byrne sent to his personal account

---

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

attached hundreds of documents containing ***thousands of pages*** of highly sensitive confidential, proprietary, trade secret and attorney-client privileged information and communications relating to Ameris, its employees and its customers.

69.     The confidential, proprietary and trade secret information contained in the Ameris documents that Byrne sent to his personal email account includes the following:

a.     Information relating to customer leases and accounts, which included sensitive customer banking and financial information, including without limitation, dates of birth, addresses, credit scores, and social security numbers;

b.     Detailed nonpublic financial information relating to Ameris and the Balboa division, including profit and loss statements, budget forecasts, income projections, strategic plans and risk assessments;

c.     Non-public Ameris business strategy slide decks, meeting minutes and notes related to the slide decks;

d.     Non-public financial information relating to the contemplated acquisitions of various entities;

e.     Balboa division Income Statements and Balance Sheets from October 2022 - March 2024;

f.     PII regarding Balboa division employees, salary and bonus information and information regarding employee leaves of absence; employee names and contact information, information regarding wages, bonuses, incentives and tax withholding, 401(k) and Roth IRA contributions, insurance information, and information regarding employee leaves of absence and paid time off.

g.     Attorney-client privileged communications between Ameris's Chief Legal Officer and various Ameris executives;

h.     Legal Metrics reports containing: 1) attorney-client privileged communications and work product, including legal strategy and voluminous billing records relating to legal services provided to Balboa and Ameris; and 2) highly sensitive customer data, including the identities and details of

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

customer loans, payment status and guarantor information; and

i.    Summaries of attorney-client and Bank Examination privileged communications.

70.    Byrne sent many of these documents to himself in order to bolster support for his arguments regarding his entitlement to additional LTIP compensation, with the ultimate intention of keeping them for use or reference in subsequent litigation against Ameris. Byrne also took and kept documents that he believed would support litigation on behalf of other Ameris employees who he likewise believed to have claims against Ameris. Finally, Byrne sent other documents to himself in order to create and maintain an unauthorized personal archive of Ameris information for personal purposes unrelated to Ameris business, including his future business endeavors. Byrne did not take these documents for use in the ordinary course of business within the scope of his regular Ameris job duties. The following are just a few examples of emails that Byrne sent to himself including Ameris's confidential, proprietary and trade secret information.

71.    On May 7, 2022, Byrne sent an email to his personal e-mail account attaching a spreadsheet entitled "Copy of Declines Q1 2022 with tabs.xlsx," which contains highly sensitive customer information regarding approximately 4,800 leases that included borrower names, equipment cost, equipment description, industry, parent vendor, vendor, time in business, FICO score, CBR Trades (credit bureau report tradelines), open trades (open tradelines), BCSCA (business credit score-commercial account), capacity, capacity %, Paynet score, Balboa score, credit grade, reason for decline and other notes, including financial information relating to the loans' personal guarantors.

72.    On June 17, 2022, Byrne sent an email to his personal e-mail account attaching a spreadsheet entitled "EarlyPaymentDefaultReport.xlsx," which contains highly sensitive information regarding 23 customers' delinquent leases, including names, address, broker information, commission information, and amounts due for each lease/loan identified. The spreadsheet also contains ***attorney-client privileged*** commentary from Ameris's Legal Department regarding the delinquent customer leases.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

73. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

74.    On March 10, 2022, March 11, 2022, March 30, 2022, April 6, 2022, April 13, 2022, April 27, 2022, May 4, 2022, August 24, 2022, Byrne sent emails to his personal e-mail account, attaching spreadsheets entitled "LegalMetrics.xlsx," which contain detailed legal metric reports for hundreds of leases with lease numbers and associated names of lessees, including details related to lawsuits filed by Balboa, with important dates in the litigations, amounts sought by Balboa, counsel information, attorney fees incurred, invoiced, and legal line items for amounts invoiced.

75. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

76.    On September 7, 2022, Byrne sent an email to his personal e-mail account, attaching several spreadsheets including one entitled "Top Vendors AUG 8-31-22.xls," which contains highly sensitive information regarding Ameris's vendors, including a ranked list of the top 100 vendors, with names and amounts funded by each vendor.

77.    On July 18, 2023, Byrne sent an email to his personal e-mail account attaching a Statement of Work from an Ameris vendor for a risk modeling project, containing highly sensitive information regarding Ameris's risk strategies.

*AMERIS BANK v. PATRICK BYRNE*          Case No.  8:26-cv-00393-MWC-JDE
AMENDED COMPLAINT                                                    Page 18

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

78.     On August 28, 2023, Byrne sent an email to his personal e-mail account attaching a spreadsheet entitled "Tax Refunds and Settlement.xlsx" which contains highly confidential tax information.

79.     On January 21, 2024, Byrne sent an email to his personal e-mail account including attorney-client privileged communications regarding the elimination of another employee's position.

80.     On January 25, 2024, Byrne sent an email to his personal e-mail account including the comments from another Ameris employee's performance review.

81.     On March 8, 2024, Byrne sent an email to his personal e-mail account regarding personnel issues with a former executive employee, Robert Rasmussen, who subsequently sued Ameris Bank (the lawsuit was voluntarily dismissed).

82.     While Byrne sent documents to his personal email throughout his employment, there was an uptick in the volume of Ameris documents Byrne sent from his Ameris e-mail account to his personal e-mail account in the final days of his employment as Byrne gathered information that he intended to keep and use for future litigation and other personal use, including future business endeavors.

83.     [REDACTED]

84.     [REDACTED] Byrne also sent himself a spreadsheet entitled "STIP Deals – Booked vs Cash Received Q1 2024," which includes hundreds of customer account numbers, lease numbers, lease terms, the credit and debit amounts on the leases with each client, and how much is still owed.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

85. ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████, Byrne produced several thousand pages of Ameris documents containing confidential, proprietary and trade secret information, including 48 voluminous spreadsheets, some of which are hundreds of pages long. Byrne's production included: a) spreadsheets containing a list of thousands of customer names and identifiers, corresponding lease information including lease numbers, equipment descriptions, lease terms and financial information relating to each lease; ████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████.

86. A comparison of the documents Byrne produced with the e-mails Ameris discovered during its ESI review of his Ameris e-mail account revealed that Byrne had only produced misappropriated Ameris documents that he believed would further his litigation objectives in the prior litigation. Byrne withheld many other documents he misappropriated, including, notably, documents containing details relating to Ameris's customers and loans, attorney-client privileged communications and employee PII.

87. Moreover, Byrne's document production did not include *any* of the e-mails *forwarding* the Ameris documents from his Ameris e-mail account to his personal e-mail account. Upon information and belief, this was an attempt by Byrne to conceal *how* he had come to possess the Ameris documents.

88. Following Ameris's requests, Byrne finally produced some of the e-mails from his own personal account attaching the documents he took, but not until December 1, 2025 – *the day after discovery closed in his lawsuit against Ameris*.

89. During his October 27, 2025 deposition in connection with his lawsuit against Ameris, Byrne admitted what Ameris was uncovering in its own investigation –that he had e-mailed numerous documents from his Ameris e-mail account to his personal e-mail account. Byrne also admitted that the company's non-public financial information

---

*AMERIS BANK v. PATRICK BYRNE*    Case No.  8:26-cv-00393-MWC-JDE
AMERIS COMPLAINT    Page 20

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

(including profit and loss statements, Balboa assets, liability and equity, budget forecasts and income projections), information relating to Balboa's loans, loan assessments, risk assessments, strategic plans, priorities and timelines, client information, and personal information about Balboa's employees, including salary, overtime, sales and origination quotas, and performance evaluations, was confidential. In short, Byrne conceded that most of the documents he sent to his personal e-mail account contained confidential Ameris information.

90. Byrne also acknowledged during his deposition that he had also saved certain Ameris documents on his personal computer, and that he also had stored "things in the cloud."

91. Byrne testified that he understood that he was prohibited from removing or transferring confidential or trade secret information, "except for as required in the course of his or her employment." Because transmission of this information was not permitted, let alone required, for his employment, he knew that his conduct violated his contractual obligations and other Ameris policies intended to maintain the secrecy and security of Ameris's confidential, proprietary and trade secret information.

92. Byrne further understood that he was required to return the company's confidential information upon termination of employment.

93. When asked whether he received permission to send Ameris documents to himself, Byrne responded that "it was pretty common knowledge that I would use my personal computer for – yeah, to work at home."

94. In fact, Ameris personnel never gave Byrne permission to transmit Ameris documents to his personal email account (or any other non-Ameris account), to use his personal computer to review such documents, to copy and store Ameris's confidential, proprietary and trade secret information on personal devices, private email accounts or other online accounts, to use such information and documents for personal benefit in his litigation or business endeavors outside the scope of his employment with Ameris, or to permanently retain such information and documents for his own use after termination.

---

*AMERIS BANK v. PATRICK BYRNE*                    Case No.  8:26-cv-00393-MWC-JDE
AMENDED COMPLAINT                                                    Page 21

Indeed, Ameris policies make it abundantly clear that these practices are strictly forbidden.

95.    When pressed as to whether he received express permission to send Ameris documents to himself, Byrne admitted that he did not know if he "got specific permission to send documents."

96.    Byrne further testified that he could not recall whether anyone at Ameris authorized him to keep Ameris documents after his employment ended.

97.    Byrne explained that while he could not recall returning Ameris documents after his employment ended, "Ameris never asked for them back as well."

98.    Byrne was incorrect.  In fact, Ameris did ask Byrne to return any Ameris property and "company confidential trade secret, client or customer information" – *in writing* – at the time he was terminated and many times thereafter.

99.    When asked why he sent Ameris documents to his personal e-mail account, Byrne stated that "it was pretty clear that [he] was going to use them for this lawsuit" because he "didn't feel confident that Ameris would disclose" the documents.

100.    Byrne clarified that when he took many of the documents at issue, he knew he was likely going to be terminated, and specifically intended to use the documents in litigation. Byrne stated that he took the documents "for the benefit of myself" as well as for the benefit of "150 other people who weren't paid" based on his belief that he could use the documents in litigation to ensure that "the 150 employees [would] get paid."

101.    Byrne further testified that he had sent *all* Ameris documents he forwarded to his personal e-mail account to his then counsel, Esperanza Anderson. However, as discussed above, many of the documents Byrne e-mailed to himself had no relevance to his litigation. Indeed, in his prior lawsuit, - and despite the fact that they were expressly requested - Byne only produced the Ameris documents he took that he believed supported his claims against Ameris, while the rest were withheld and retained for his own benefit.

102.    Byrne made no effort to ensure that Ms. Anderson returned the documents containing Ameris's confidential, proprietary and trade secret information after he retained new counsel.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

103. Later, during the trial for his wrongful termination lawsuit, Byrne again testified that he took and retained Ameris's documents in order to be able to "prove [his] point" in litigation.

**Byrne Refuses Ameris's Efforts to Recover Its Confidential, Proprietary and Trade Secret Information and the Ameris Laptop He Retained**

104. In June 28, 2024 correspondence immediately following Byrne's termination, Ameris requested the return of Byrne's Ameris-owned laptop.

105. Byrne refused to return the laptop.

106. Following Byrne's termination, Ameris "locked" the Ameris laptop that Byrne retained, so that he would no longer have access to anything on it, including any documents saved locally. Once the laptop was returned, Ameris could "unlock" the laptop in order to review Byrne's activity on the laptop.

107. In the following months, and throughout his prior litigation, Ameris continued to demand that Byrne return his Ameris laptop and any other Ameris and property in his possession, including on January 7, 2025, January 17, 2025, March 4, 2025, November 6, 2025 and November 12, 2025. Byrne insisted that he was not in possession of any Ameris property, despite not returning the Ameris laptop.

108. Byrne never returned the laptop, claiming that he could not recall what happened to it.

109. After Byrne's deposition, Ameris's counsel sent correspondence to Byrne's counsel (Ms. Anderson) on November 6, 2025. Among other matters addressed, Ameris cited Byrne's confidentiality obligations to Ameris and demanded that Byrne identify and return all Ameris documents and property, including all documents that had not been produced but that Byrne had e-mailed to his personal e-mail account (or otherwise obtained) and later disclosed to Ms. Anderson.

110. During a November 12, 2025 meet and confer telephone conference with Byrne's counsel, Ameris's counsel again demanded that Byrne return Ameris's property, including the Ameris laptop and documents containing Ameris's confidential and

proprietary information. Ameris's counsel also inquired as to Byrne's claim during his deposition that he sent all of the documents he e-mailed to himself to Ms. Anderson.

111. In November 12, 2025 correspondence with Ameris's counsel (purportedly to memorialize that day's conference call), Ms. Anderson stated: "I have received many emails from [Byrne] from his email account shortly before his deposition and that I have not had a chance to parse through them."

112. Ms. Anderson further stated: "I told you that I will produce any documents that are responsive to the discovery requests and that I would search for, return and purge any documents *that are privileged*." However, as Ms. Anderson was well aware, Ameris's demand for the return of documents was not limited to privileged documents, but rather all documents containing Ameris's confidential, proprietary and trade secret information, *including* privileged documents.

113. In November 17, 2025 correspondence directed to Ms. Anderson, Ameris's counsel *reiterated its demand for the identification and return of all Ameris documents and property*:

> "As discussed on our call, during his October 27 testimony, [Byrne] admitted that the documents he was in possession of were confidential, that he knowingly forwarded himself these documents from his work email to his personal [email] account, that he may have put the documents on the cloud, and that he sent all such documents to you. Your comment that 'I told you that I have received many emails from [Byrne] from his [personal email] account shortly before his deposition and that I have not had a chance to parse through them' is very troubling and raises further questions. Did you receive the documents 'shortly before' [Byrne]'s cancelled deposition on September 23, or his most recent testimony on October 27? Or earlier? In any event, since you produced documents in late September, you were plainly on notice by September at the latest that you were in possession of confidential and privileged Ameris documents. You had an obligation to review and return the confidential documents immediately and purge any privileged documents.

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

Also, how did [Byrne] send you the documents at PLAINTIFF001088-1136, and where was [Byrne] storing these documents if you did not have any emails from [Byrne] at the time of [Byrne]'s document production on September 20? Moreover, did you make any effort to compile Ameris confidential and privileged documents from [Byrne] prior to – or even upon - receiving document requests from Ameris on March 3, 2025? If so, why did [Byrne] wait until September or October 2025 to send you any emails?

Your assertion that you have been busy taking multiple defense witness depositions does not excuse [Byrne] or you from returning Ameris' confidential and privileged information. This should have been done, at the latest, when [Byrne] left Ameris. We again asked when [Byrne] will return Ameris' laptop. You responded only that you would 'ask [Byrne] again.' Ameris also demanded the redaction and designation of documents produced by Byrne in his lawsuit that contained confidential information and/or information protected by the attorney-client and Bank Examination privileges. While Byrne agreed to stamp some of the documents 'Confidential,' Byrne refused to redact the documents containing privileged communications."

114. Discovery closed in that matter on November 28, 2025, and Byrne did not produce, redact or return any of the requested documents by that date.

115. Byrne also never requested that Ms. Anderson return Ameris's documents, and indeed, Ms. Anderson never returned any of Ameris's documents.

116. Later, during Byrne's wrongful termination trial in June 2026, he testified that he "do[es]n't want [Ameris's confidential] information" and is "willing to give it back" but that "every time [he] put[s] that out to Ameris, … they just want to … keep all this litigation going." Byrne further testified: "I will stand here today and say if you want that information back, then -- and you want me to destroy it, yeah I will absolutely do that." When Byrne's counsel asked Byrne to confirm he would give the documents back, Byrne stated "Yes."

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

117.   This testimony was absolutely and demonstrably false. Neither Byrne nor any of his lawyers has ever reached out to Ameris to suggest returning, deleting and destroying the confidential, proprietary and trade secret information that Byrne took. Ameris has repeatedly clarified that it needs this information, not only to protect its proprietary trade secrets and confidential data, but also to protect confidential PII belonging to individual employees and consumers that Ameris has a continuing legal and ethical duty to protect. Despite Ameris's many requests, including after Byrne testified at trial that he would "absolutely" return Ameris's documents, he has continually refused to do so.

118.   Specifically, on June 30, 2026 (following the conclusion of the trial of Byrne's wrongful termination claim), Ameris's counsel contacted Byrne's counsel and requested a meeting to confer regarding Mr. Byrne's trial testimony that he was "absolutely" willing to return Ameris's documents. On July 2, 2026, counsel met and conferred. Ameris's counsel requested the return of the documents and a reasonable forensic protocol designed to identify and remove the Ameris documents from Byrne's devices.

119.   To date, Mr. Byrne has failed to return *any* of the documents he took from Ameris containing its confidential, proprietary and trade secret information. Mr. Byrne has also expressly rejected Ameris's demand for a reasonable forensic protocol.

120.   On July 29, 2026, Ameris's counsel wrote to Byrne's counsel again reiterating its demand that Byrne return the documents he misappropriated during his employment and further agree to a reasonable forensic protocol.

**Ameris Has Reason to Believe that Byrne Has Disclosed, and May Continue to Disclose, Confidential, Proprietary and Trade Secret Information Without Ameris's Knowledge or Authorization**

121.   On or about January 13, 2026, Ameris received the file of Deborah Dickson, the economic expert for Byrne in his lawsuit against Ameris.

122.   The file contained emails from Byrne's former employee, Jacqueline Emert ("Emert"), to Byrne's expert on November 25, 2025 and December 18, 2025 attaching, inter alia, a spreadsheet containing a confidential pricing model with Ameris's non-public

---

*AMERIS BANK v. PATRICK BYRNE*                         Case No.  8:26-cv-00393-MWC-JDE
AMENDED COMPLAINT                                              Page 26

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

financial data. The spreadsheet (and others included in Emert's email to Byrne's expert), was among the documents that Byrne sent to his personal email account for personal use, including for use in litigation.

123. The only logical explanation (or at a minimum, a very plausible explanation) for Emert's possession and transmission of this document is that Byrne improperly disclosed it to her in connection with his litigation against Ameris. Byrne and Emert had a close working relationship, and Emert was personally involved in Byrne's prosecution of his prior lawsuit against Ameris, including by providing confidential Ameris documents to Byrne's expert at Byrne's request.

124. Ameris has further reason to believe that Byrne has disclosed, and will continue to disclose confidential, proprietary and trade secret information to Emert in connection with Emert's own anticipated litigation against Ameris. Emert recently sent Ameris a demand letter, through the same counsel representing Byrne in this matter, requesting her personnel file records in anticipation of litigation against Ameris.

125. Byrne has already testified under oath that he took confidential, proprietary and trade secret information from Ameris with the intention of using it in litigation for the benefit of himself as well as for the "150 other people" (including Emert), who he believes were subject to the LTIP's compensation provisions.

126. Byrne has already disclosed Ameris's confidential, proprietary and trade secret information to Emert, and, on information and belief, will continue to do so in alignment with his stated intention to use such information for the benefit of "150 other people" through litigation.

127. On July 28, 2026, Byrne's counsel issued a press release in connection with the entry of judgment in Byrne's lawsuit against Ameris. In that press release, Byrne's counsel confirmed that they intend to institute litigation on behalf of the same employees Byrne claimed that he took misappropriated documents on behalf of:

> "'This case was never about just one plaintiff,' added Stacey Villagomez of Allen Matkins. 'Roughly 150 employees transitioned from Balboa Capital to Ameris, and

---

*AMERIS BANK v. PATRICK BYRNE*　　　　　　　Case No.  8:26-cv-00393-MWC-JDE
AMENDED COMPLAINT　　　　　　　　　　　　　　　　Page 27

many were potentially affected by the same LTIP practice, resulting in underpaid earned wages. Allen Matkins is preparing additional claims on behalf of other affected individuals.'"

128. Upon information and belief, Byrne and/or his counsel have utilized confidential, proprietary and trade secret information contained in documents covered by the parties' Protective Order in the prior lawsuit as well as other documents removed from Ameris by Byrne but not produced in the prior litigation in order to prepare litigation on behalf of other Ameris employees.

**Byrne Has Also Used and Will Continue to Use Ameris' Confidential Information for His Own Business Purposes**

129. Byrne has also intentionally used Ameris's confidential, proprietary and trade secret information to compile a personal archive of Ameris data for personal purposes unrelated to Ameris's business, including his own business endeavors.

130. On information and belief, Byrne is in the early stages of developing another business enterprise.

131. Based on the foregoing allegations, Byrne has access to confidential Ameris employee contact information, salary information and other HR related data that he has used, and may continue to use, to recruit Ameris employees to join his business, and to otherwise develop his business. For example, on information and belief, Byrne has already relied on Ameris information to recruit two former Ameris employees, Maddie Lucas and Nic Olmedo, both of whom were previously Loan Operations managers for Ameris, to join his new business.

132. Byrne has engaged Emert to actively reach out to current Ameris employees, including those in the Loan Operations department, on Byrne's behalf, in order to recruit them to work for his new business. Byrne has previously disclosed Ameris's confidential, proprietary and trade secret information to Emert for his own purposes, and is continuing to do so now to advantage and grow his new business.

133. Meanwhile, Byrne has offered no explanation whatsoever for his repeated

---

refusal to return Ameris's confidential, proprietary and trade secret documents (despite testifying that he does not want such information and is "absolutely" willing to return it), nor has he offered any explanation for his unwillingness to enter into a reasonable forensic protocol. Byrne's repeated insistence on keeping Ameris documents that he knows he has no legal right to plausibly supports his past and continuing intent to use them for unauthorized personal purposes.

### Ameris Is at Risk of a Serious Data Breach Due to Byrne's Misconduct

134.    Every day that Byrne continues to retain and use (while refusing to destroy and return) Ameris's confidential, proprietary and trade secret information adds to the serious risks of a data breach.

135.    While most personal emails are encrypted *in transit*, the email provider Byrne uses does not offer native, built-in, end-to-end encryption for its e-mail, meaning the contents of e-mails are not encrypted in a way that only the sender and recipient can access them. Therefore, anyone with access to Byrne's e-mail account (for example, by password compromise or hacking) may access the e-mail messages and documents contained in Byrne's email account in plain text.

136.    Moreover, the Ameris documents in Byrne's possession are also located on his personal computer, cloud accounts, and potentially other devices and accounts, which are not secure.

137.    Ameris has sustained substantial damages with respect to Byrne's misconduct.

138.    Ameris's investigation is ongoing, and it reserves the right to add additional claims in the future as the evidence warrants.

### COUNT I

### Breach of Contract

139.    Ameris refers to, and incorporates herein by reference, the allegations contained in paragraphs 1 through 138 of the Complaint as if fully set forth herein.

140.    Ameris and Byrne are parties to the Confidential Information Agreement and

---

*AMERIS BANK v. PATRICK BYRNE*                    Case No.  8:26-cv-00393-MWC-JDE
AMENDED COMPLAINT                                                          Page 29

Acceptable Use Policy.

141. The agreements are supported by adequate consideration.

142. Ameris has performed all of its obligations under the above-referenced agreements.

143. The above-referenced agreements are legally binding contracts between Ameris and Byrne.

144. Byrne materially breached the above-referenced agreements, inter alia, by: 1) forwarding numerous Ameris documents containing confidential, proprietary, trade secret and attorney-client privileged information and communications to his unencrypted personal e-mail account; 2) using his personal laptop, personal cloud accounts and other devices or accounts to copy, store and retain such documents; 3) refusing to return such documents upon the termination of his employment and/or upon demand by Ameris; 4) refusing to return his Ameris laptop upon the termination of his employment and/or upon demand by Ameris; and 5) making personal use of Ameris's confidential, proprietary and trade secret information, including for purposes of litigation in his own lawsuit, anticipated litigation to be brought by Emert or others, and personal business use outside the scope of his Ameris employment.

145. As a proximate result of Byrne's breaches of the Confidential Information Agreement and Acceptable Use Policy, among other agreements and policies, Ameris has sustained, and will continue to sustain, damages.

146. Ameris has sustained, and will continue to sustain, damages, including, but not limited to, forensic data and legal costs, other costs relating to ensuring legal and regulatory compliance, costs to address Byrne's data breach, and attorney's fees, in an amount to be determined at trial.

## COUNT II

**Misappropriation in Violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1832 *et seq*.**

147. Ameris repeats, realleges, and incorporates paragraphs 1 through 146 as if

---

*AMERIS BANK v. PATRICK BYRNE*  Case No.  8:26-cv-00393-MWC-JDE
AMENDED COMPLAINT

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

fully set forth herein.

148.   The DTSA defines a "**trade secret**" as: "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

**(A)** the owner thereof has taken reasonable measures to keep such information secret; and

**(B)** the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. 18 U.S.C. § 1839 (3).

149.   The DTSA defines "**misappropriation**" to include **two alternative forms of misconduct**, each of which independently establish a violation under the Act. Specifically, "misappropriation" is defined to include **either** of the following:

"**(A) acquisition** of a trade secret of another **by a person who knows or has reason to know that the trade secret was acquired by improper means**; **or**

**(B) disclosure or use** of a trade secret of another **without express or implied consent** by a person who" knew or had reason to know that the trade secret was acquired through **improper means** or who acquired the trade secret "under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret" among other circumstances. 18 U.S.C. § 1839 (5).

150.   The DTSA defines "**improper means**" to include the "**breach of a duty to maintain secrecy**." 18 U.S.C. § 1839(6).

151.   Ameris engages in interstate commerce across the United States.

152.   Ameris is the owner of certain documents relating to its business that contain financial, operations, economic and customer information. This information qualifies as

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

"trade secrets" as defined by the DTSA.

153. Ameris's trade secrets derive independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use.

154. The trade secrets have been developed by Ameris at great time and cost.

155. Ameris closely guards and takes reasonable steps to protect against the unauthorized misappropriation and disclosure of trade secrets, including, but not limited to: implementing the aforementioned policies and procedures to govern the access, use, and disclosure of information and documents, including providing unique usernames and passwords for logging in to the Ameris database, secured portal access, and utilizing encryption programs, among other security measures.

156. During the course of his employment relationship, Byrne was given access to Ameris's trade secrets, and had a duty to keep such information confidential.

157. As set forth above, Byrne was required to adhere to various Ameris policies regarding the access, use, and disclosure of Ameris's trade secrets. By engaging in the conduct discussed above, Byrne violated those policies.

**Improper Acquisition**

158. Byrne engaged in trade secret misappropriation when he knowingly "acquired" Ameris's trade secret information by "improper means."

159. Byrne "acquired" trade secrets by, inter alia: (1) emailing them to his personal email account; (2) copying and saving them in his personal cloud storage accounts and devices, including her personal laptop/s; and (3) retaining and refusing to return them after termination despite Ameris's repeated requests.

160. As alleged above, Byrne acquired these trade secrets by "improper means" when he obtained them through conduct that he knew breached his duty to maintain the secrecy of Ameris information under the CI Agreement, Acceptable Use Policy and Code of Conduct, among other Ameris agreements and policies. 18 U.S.C. § 1839(6). Byrne further acquired these trade secrets by "improper means" when he did so with the express

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

intent to use documents containing Ameris's trade secrets in litigation against Ameris (both for his own benefit and that of other employees) and to keep and use them for his own personal benefit, including for purposes of recruiting Ameris employees to work for his new company or otherwise benefiting his business endeavors, again in breach of his contractual duty to maintain the secrecy of confidential Ameris information.

161. Specifically, Byrne improperly acquired Ameris's trade secrets when he knowingly breached his duty to maintain secrecy under the CI Agreement by: (1) duplicating, removing, transferring, disclosing and using Ameris's trade secrets; (2) allowing others (including Ms. Anderson and Ms. Emert) to do the same; and (3) seeking to permanently store and possess Ameris's trade secrets by repeatedly refusing to return them post-termination despite Ameris's requests, all outside the scope of his job duties and without the prior written authorization of Ameris's President or CIO.

162. Byrne also improperly acquired Ameris's trade secrets when he knowingly breached his duty to maintain secrecy under the Acceptable Use Policy by: (1) sending private customer information by unencrypted email; (2) using Ameris networks or devices to access personal email accounts, such as Gmail, Hotmail, Yahoo, etc.; (3) connecting non-approved personal laptops or other devices to the Ameris network; (4) using Ameris email in violation of Ameris's policies; (5) using Ameris company equipment and resources for purposes not authorized by Ameris; (6) copying files belonging to Ameris; and (7) sending email communications to third party email systems with the intent of circumnavigating Ameris policies, all without authorization from the Information Technology Department. Byrne further improperly acquired Ameris's trade secrets in breach of the Acceptable Use Policy when he sought to establish permanent possession over them by failing to immediately report his own information breaches, including instances when he sent himself attachments containing: customer and employee PII, Ameris trade secrets and intellectual property, and information that Byrne knew "could expose Ameris to litigation" (including because he specifically intended to use this information against Ameris in litigation).

*AMERIS BANK v. PATRICK BYRNE*                    Case No.  8:26-cv-00393-MWC-JDE
AMENDED COMPLAINT                                  Page 33

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

163.    To establish misappropriation based on ***improper acquisition***, Ameris need not separately allege any particular "use," including any unauthorized or unlawful use of its trade secrets. *See, e.g., OEGG, Inc. v. Pierce Egg Co.*, No. 5:26-CV-02725-CAS-DTBX, 2026 WL 1823015, at \*14 (C.D. Cal. June 24, 2026) (citations omitted). Nevertheless, Byrne also engaged in unauthorized use or disclosure as alleged herein and further described below.

**Unauthorized Disclosure or Use**

164.    Byrne further engaged in trade secret misappropriation when he disclosed or used Ameris's trade secrets without Ameris's express or implied consent, while knowing that he had acquired the trade secrets through improper means and under circumstances giving rise to a duty to maintain secrecy (as described above).

165.    Specifically, Byrne engaged in unauthorized disclosure or use when he: (1) used Ameris's trade secret documents in his prior litigation, without Ameris's permission and with the intent of strengthening his litigation positions against Ameris; (2) disclosed and used Ameris's trade secret documents by sharing them with Emert for purposes of bolstering his expert's report in his prior litigation and, on information and belief, supporting Emert's separate, anticipated litigation against Ameris, again without Ameris's authorization; and (3) used Ameris's trade secret information (and further disclosed such information to Emert), on information and belief, for purposes of soliciting and recruiting Ameris employees to work for his new business enterprise. Ameris has further alleged unauthorized use and intent to use Ameris's trade secrets by virtue of Byrne's repeated refusal to return (and insistence of retaining) Ameris's trade secret data despite testifying to the jury in his prior lawsuit that he would "absolutely" do so because he didn't want or need such data.

166.    Byrne's conduct as alleged herein demonstrates more than passive possession of documents that were legitimately or incidentally acquired during the course of employment. To the contrary, these facts show deliberate and improper acquisition for personal purposes, continuing dominion and control, selective use, concealment, and

---

*AMERIS BANK v. PATRICK BYRNE*                     Case No.  8:26-cv-00393-MWC-JDE
AMENDED COMPLAINT                                              Page 34

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

unauthorized disclosure. Specifically, the following actions by Byrne demonstrate his improper acquisition, use and disclosure under the DTSA: 1) Byrne's admission that he took and used such information to "prove [a] point" in litigation for the benefit of himself and others, while knowing that such actions violated his duty to maintain the secrecy of Ameris data under his agreements with Ameris and Ameris policies; 2) his admission that he stored such information for permanent access on his personal computer and cloud accounts, again, in knowing violation of his duty to maintain the secrecy of Ameris data; 3) his selective disclosure of a limited subset of the documents in litigation; 4) his initial withholding of the forwarding emails showing how he obtained the documents; 5) his unauthorized disclosure of such information to his former executive assistant, Emert, for personal litigation and business purposes; and 6) his efforts to control the documents and narrative surrounding them by testifying under oath that he was "absolutely" willing to return them, while adamantly and persistently refusing to do so.

167. Byrne's conduct, described herein, constitutes misappropriation of Ameris's trade secrets in violation of DTSA. Indeed, taking improperly acquired trade secrets for personal use in litigation, alone, establishes misappropriation under the DTSA.

168. As a direct and proximate result of Byrne's violation of DTSA, Ameris has suffered damages, including, but not limited to, forensic data and legal costs, other costs relating to ensuring legal and regulatory compliance, costs to address Byrne's data breach, and attorney's fees.

169. In addition, on information and belief, Byrne's misappropriation was willful and malicious, with the wrongful and deliberate intent of injuring Ameris, and with a conscious disregard for Ameris's rights and Byrne's obligations under federal law. Ameris is therefore entitled to an award of compensatory and punitive damages and reasonable attorneys' fees and costs incurred herein in accordance with 18 U.S.C. § 1836(b)(3).

## COUNT III

### Misappropriation in Violation of Cal. Civ. Code §§ 3426 et seq. ("CUTSA")

170. Ameris repeats, realleges, and incorporates paragraphs 1 through 169 as if

---

*AMERIS BANK v. PATRICK BYRNE*                    Case No. 8:26-cv-00393-MWC-JDE
AMENDED COMPLAINT                                                      Page 35

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

fully set forth herein.

171.   The California Uniform Trade Secrets Act ("CUTSA") prohibits any person from using the trade secrets of another for that person's commercial advantage.

172.   CUTSA defines "***trade secrets***" to include "information, including a formula, pattern, compilation, program, device, method, technique or process, that: 1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and 2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d).

173.   CUTSA defines "***misappropriation***" to include ***two alternative forms of misconduct***, each of which ***independently*** establish a violation under the Act. Specifically, "misappropriation" is defined to include ***either*** of the following:

   "**(A)** ***acquisition*** of a trade secret of another ***by a person who knows or has reason to know that the trade secret was acquired by improper means***; <u>**OR**</u>

   **(B)** ***disclosure or use*** of a trade secret of another ***without express or implied consent*** by a person who" knew or had reason to know that the trade secret was acquired through ***improper means*** or was acquired "under circumstances giving rise to a duty to maintain its secrecy or limit its use" or from or through "a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use" among other circumstances. Cal. Civ. Code § 3426.1(b) (emphasis added).

174.   CUTSA defines "***improper means***" to include the "***breach of a duty to maintain secrecy***." Cal. Civ. Code § 3426.1(a) (emphasis added).

175.   Ameris is the owner of certain documents containing confidential, proprietary and trade secret information, which includes, but is not limited to, financial, operation, economic and customer information. The information constitutes "trade secrets" as defined by CUTSA.

176.   Ameris's trade secrets derive independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable by proper

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

means by other persons who can obtain economic value from their disclosure or use.

177. The trade secrets have been developed by Ameris at great time and cost.

178. By reason of his employment and high-level position with Ameris, Byrne had access to Ameris's trade secrets.

179. Ameris closely guards and takes reasonable steps to protect against the unauthorized misappropriation and disclosure of trade secrets, including, but not limited to: implementing the aforementioned policies and procedures to govern the access, use, and disclosure of information and documents, including providing unique usernames and passwords for logging in to the Ameris database, secured portal access, and utilizing encryption programs, among other security measures.

180. As set forth above, Byrne was required to adhere to various Ameris policies regarding the access, use, and disclosure of Ameris's trade secrets. By engaging in the conduct discussed above, Byrne violated those policies.

**Improper Acquisition**

181. Byrne engaged in trade secret misappropriation when he knowingly "acquired" Ameris's trade secret information by "improper means." Cal. Civ. Code § 3426.1(b)(1).

182. Byrne "acquired" trade secrets by, inter alia: 1) emailing them to his personal email account; 2) copying and saving them in his personal cloud storage accounts and devices, including her personal laptop/s; and 3) retaining and refusing to return them after termination despite Ameris's repeated requests.

183. As alleged above, Byrne acquired these trade secrets by "improper means" when he obtained them through conduct that he knew breached his duty to maintain the secrecy of Ameris information under the CI Agreement, Acceptable Use Policy and Code of Conduct among other Ameris agreements and policies. Cal. Civ. Code § 3426.1(a). Byrne further acquired these trade secrets by "improper means" when he did so with the express intent to use Ameris's trade secrets in litigation against Ameris (both for his own benefit and that of other employees) and to keep and use them for his own personal benefit,

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

including for purposes of recruiting Ameris employees to work for his new company or otherwise benefiting his business endeavors, again in breach of his contractual duty to maintain the secrecy of confidential Ameris information.

184. Specifically, Byrne improperly acquired Ameris's trade secrets when he knowingly breached his duty to maintain secrecy under the CI Agreement by: 1) duplicating, removing, transferring, disclosing and using Ameris's trade secrets; 2) allowing others (including Ms. Anderson and Ms. Emert) to do the same and 3) seeking to permanently store and possess Ameris's trade secrets by repeatedly refusing to return them post-termination despite Ameris's requests, all outside the scope of his job duties and without the prior written authorization of Ameris.

185. Byrne also improperly acquired Ameris's trade secrets when he knowingly breached his duty to maintain secrecy under the Acceptable Use Policy by: 1) sending private customer information by unencrypted email; 2) using Ameris networks or devices to access personal email accounts, such as Gmail, Hotmail, Yahoo, etc.; 3) connecting non-approved personal laptops or other devices to the Ameris network; 4) using Ameris email in violation of Ameris's policies; 5) using Ameris company equipment and resources for purposes not authorized by the Chief Innovation Officer; 6) copying files belonging to Ameris; and 7) sending email communications to third party email systems with the intent of circumnavigating Ameris policies, all without authorization from the Information Technology Department. Byrne further improperly acquired Ameris's trade secrets in breach of the Acceptable Use Policy when he sought to establish permanent possession over them by failing to immediately report his own information breaches, including instances when he sent himself attachments containing: customer and employee PII, Ameris trade secrets and intellectual property, and information that Byrne knew "could expose Ameris to litigation" (because he specifically intended to use this information against Ameris in litigation).

186. To establish misappropriation based on *improper acquisition*, Ameris need not separately allege any particular "use," including any unauthorized or unlawful use of

---

*AMERIS BANK v. PATRICK BYRNE*                    Case No.  8:26-cv-00393-MWC-JDE
AMENDED COMPLAINT                                 Page 38

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

its trade secrets. *See, e.g.*, *San Jose Constr., Inc. v. S.B.C.C., Inc.*, 155 Cal. App. 4th 1528, 1544 (2007). Nevertheless, Byrne also engaged in unauthorized use or disclosure as alleged herein and further described below.

**Unauthorized Disclosure or Use**

187. Byrne further engaged in trade secret misappropriation when he disclosed or used Ameris's trade secrets without Ameris's express or implied consent, while knowing that he had acquired the trade secrets through improper means and under circumstances giving rise to a duty to maintain secrecy (as described above).

188. Specifically, Byrne engaged in unauthorized disclosure or use when he: 1) Ameris's trade secret documents in his prior litigation, without Ameris's permission and with the intent of strengthening his litigation positions against Ameris; (2) disclosed and used Ameris's trade secret documents by sharing them with Emert for purposes of bolstering his expert's report in his prior litigation and, on information and belief, supporting Emert's separate, anticipated litigation against Ameris, again without Ameris's authorization; and (3) used Ameris's trade secret information (and further disclosed such information to Emert), on information and belief, for purposes of soliciting and recruiting Ameris employees to work for his new business enterprise. Ameris has further alleged unauthorized use and intent to use Ameris's trade secrets by virtue of Byrne's repeated refusal to return (and insistence of retaining) Ameris's trade secret data despite testifying to the jury in his prior lawsuit that he would "absolutely" do so because he didn't want or need such data.

189. Byrne's conduct as alleged herein demonstrates more than passive possession of documents that were legitimately or incidentally acquired during the course of employment. To the contrary, these facts show deliberate and improper acquisition for personal purposes, continuing dominion and control, selective use, concealment, and unauthorized disclosure. Specifically, the following actions by Byrne demonstrate his improper acquisition, use and disclosure under the CUTSA: 1)  Byrne's admission that he took and used such information to "prove [a] point" in litigation for the benefit of himself

---

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

and others, while knowing that such actions violated his duty to maintain the secrecy of Ameris data under his agreements with Ameris and Ameris policies; 2) his admission that he stored such information for permanent access on his personal computer and cloud accounts, again, in knowing violation of his duty to maintain the secrecy of Ameris data; 3) his selective disclosure of a limited subset of the documents in litigation; 4) his initial withholding of the forwarding emails showing how he obtained the documents; 5) his unauthorized disclosure of such information to his former executive assistant, Emert, for personal litigation and business purposes; and 6) his efforts to control the documents and narrative surrounding them by testifying under oath that he was "absolutely" willing to return them, while adamantly and persistently refusing to do so.

190.    Byrne's conduct, described herein, constitutes misappropriation of Ameris's trade secrets in violation of CUTSA. Indeed, taking improperly acquired trade secrets for personal use in litigation, alone, establishes misappropriation under CUTSA.

191.    As a direct and proximate result of Byrne's violation of CUTSA, Ameris has suffered damages, including, but not limited to, forensic data and legal costs, other costs relating to ensuring legal and regulatory compliance, costs to address Byrne's data breach, and attorney's fees.

192.    In addition, Byrne's misappropriation was willful and malicious, with the wrongful and deliberate intent of injuring Ameris, and with a conscious disregard for Ameris's rights and Byrne's obligations under California law. Ameris is therefore entitled to an award of compensatory and punitive damages and reasonable attorneys' fees and costs incurred herein pursuant to Cal. Civ. Code. § 3426.4.

## COUNT IV

### Violation of California Penal Code § 502

193.    Ameris repeats, realleges, and incorporates paragraphs 1 through 192 as if fully set forth herein.

194.    Byrne violated California Penal Code § 502 by, among other things, knowingly and without permission: accessing and misusing Ameris's data, computers,

---

*AMERIS BANK v. PATRICK BYRNE*    Case No.  8:26-cv-00393-MWC-JDE
AMENDED COMPLAINT    Page 40

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

computer systems or computer networks to wrongfully control or obtain confidential, proprietary, trade secret and/or attorney-client privileged information, communications and data; taking, copying and using such information and data, without approval and in violation of Ameris policies; and continuing to retain and use Ameris's computer equipment and network subsequent to the termination of his Ameris employment.

195. California Penal Code § 502 was enacted to afford businesses protection from the unauthorized access, use, copying, tampering, interference, or damage to lawfully created computer data and computer systems.

196. Under California Penal Code § 502(c) anyone who engages in any of the following acts commits a public offense:

(1) Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data;

(2) Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network;

(3) Knowingly and without permission uses or causes to be used computer services; [and]

…

(7) Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network;

….

197. California Penal Code § 502(b) defines specific words and phrases used throughout the statute including the following:

---

*AMERIS BANK v. PATRICK BYRNE*   Case No.  8:26-cv-00393-MWC-JDE
AMENDED COMPLAINT   Page 41

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

(1) "Access" means to gain entry to, instruct, cause input to, cause output from, cause data processing with, or communicate with, the logical, arithmetical, or memory function resources of a computer, computer system, or computer network.

(2) "Computer network" means any system that provides communications between one or more computer systems and input/output devices, including, but not limited to, display terminals, remote systems, mobile devices, and printers connected by telecommunication facilities.

…

(4) "Computer services" includes, but is not limited to, computer time, data processing, or storage functions, internet services, electronic mail services, electronic message services, or other uses of a computer, computer system, or computer network.

…

(8) "Data" means a representation of information, knowledge, facts, concepts, computer software, or computer programs or instructions. Data may be in any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device.

198. Byrne violated California Penal Code § 502(c)(1) when he knowingly accessed, and without permission used Ameris's computer networks and computer systems to wrongfully control and obtain Ameris data, including by sending thousands of pages of Ameris documents containing confidential, proprietary, trade secret and attorney-client privileged information and communications to his personal email account, which was not permitted under Ameris policies and was not necessary for him to perform his job duties, and then saving such data on his personal devices and accounts with the specific intent to permanently keep it for personal use in business and litigation, and subsequently refusing to return and destroy such data despite Ameris's repeated requests to do so following his employment with Ameris.

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

199. Byrne violated California Penal Code § 502(c)(2) when he knowingly accessed, and without permission took, copied and made use of data taken from Ameris computers, computer systems or computer networks, including by sending thousands of pages of Ameris documents containing confidential, proprietary, trade secret and attorney-client privileged information and communications to his personal email account, which was not permitted under Ameris policies and was not necessary for him to perform his job duties, and then copying and saving such data on his personal laptop, cloud storage and other devices and accounts for permanent personal use, and later refusing to return and destroy such data despite Ameris's repeated requests to do so following his employment with Ameris. Byrne further violated this subsection by using (or making use of) such data to bolster his personal litigation against Ameris, and, on information and belief, to support Emert's anticipated litigation against Ameris, as well as to recruit Ameris employees and otherwise develop his new business venture.

200. Byrne violated California Penal Code § 502(c)(3) when he knowingly, and without permission, used Ameris's computer services, including his Ameris laptop, internet and e-mail services in direct violation of Ameris's CI Agreement, Acceptable Use Policy, Code of Conduct and other policies and agreements, including by using such services to, inter alia: 1) send private customer information and other confidential, proprietary, trade secret and attorney-client privileged information by unencrypted email; 2) copy, store and retain such information for permanent personal use and control on his personal laptop, personal cloud accounts and other devices or accounts; and 3) use such information for purposes of litigation in his own lawsuit against Ameris, anticipated litigation to be brought by Emert, and personal business use outside the scope of his Ameris employment.

201. Byrne violated California Penal Code § 502(c)(7) when he knowingly, and without permission, accessed Ameris's computers, computer system, or computer network in direct violation of Ameris's CI Agreement, Acceptable Use Policy, Code of Conduct and other policies and agreements, including by using such devices, systems or networks

---

*AMERIS BANK v. PATRICK BYRNE*                    Case No.  8:26-cv-00393-MWC-JDE
AMENDED COMPLAINT                                                        Page 43

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

to, inter alia: 1) send private customer information and other confidential, proprietary, trade secret and attorney-client privileged information by unencrypted email; 2) copy, store and retain such information for permanent personal use and control on his personal laptop, personal cloud accounts and other devices or accounts; and 3) use such information for purposes of litigation in his own lawsuit against Ameris, anticipated litigation to be brought by Emert, and personal business use outside the scope of his Ameris employment.

202. Byrne's actions that constitute violations of California Penal Code § 502 were not committed within the scope of his lawful employment at Ameris and were not reasonably necessary to the performance of his job duties at Ameris.

203. The value of Ameris computer equipment and services wrongfully used by Byrne exceeds $1,000.

204. Ameris has sustained damages as a proximate result of Byrne's actions, including, but not limited to, forensic data and legal costs, other costs relating to ensuring legal and regulatory compliance, costs to address Byrne's data breach, and attorney's fees.

205. In addition, Byrne's misappropriation was willful and malicious, with the wrongful and deliberate intent of injuring Ameris, and with a conscious disregard for Ameris's rights and Byrne's obligations under California law.

206. Therefore, in addition to all other types of relief requested herein, Ameris is entitled to recover compensatory and punitive damages and attorneys' fees in amounts according to proof to be determined, in accordance with California Penal Code § 502.

## COUNT V

### Conversion

207. Ameris repeats, realleges, and incorporates paragraphs 1 through 206 as if fully set forth herein.

208. At all times herein, Ameris also owned, possessed, and had a right to possess computer equipment loaned to Byrne to be used exclusively in connection with his job duties on behalf of Ameris.

209. Byrne substantially interfered with Ameris's property rights by knowingly

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

and intentionally refusing to return, upon demand subsequent to Byrne's termination, Ameris's computer equipment loaned to Byrne exclusively in connection with his job duties on behalf of Ameris.

210.    Ameris was damaged as a result of Byrne's conduct, including, but not limited to, forensic data and legal costs, other costs relating to ensuring legal and regulatory compliance, and attorney's fees.

211.    In addition, on information and belief, Byrne's conversion was willful and malicious, with the wrongful and deliberate intent of injuring Ameris, and with a conscious disregard for Ameris's rights and Byrne's obligations under California law. Therefore, in addition to all other types of relief requested herein, Ameris is entitled to recover compensatory and punitive damages in amounts according to proof to be determined.

## PRAYER

WHEREFORE, Plaintiff Ameris respectfully requests that this Court enter judgment as follows:

A.    For compensatory damages in an amount to be established at trial;

B.    For punitive damages, to the extent available;

C.    For prejudgment and post-judgment interest at the maximum lawful rates;

D.    For statutory damages under California Penal Code § 502, including recoverable victim expenditures;

E.    For Ameris's attorneys' fees and costs incurred in connection with this action;

F.    For an Order permitting a neutral, court-approved forensic examiner, in accordance with an appropriate forensic protocol and protective order, to identify, preserve, recover, remove, and verify deletion of Ameris confidential, proprietary and trade secret information from relevant accounts, devices, systems and repositories;

G.    For permanent injunctive relief preventing Byrne and/or his agents, servants, employees, and all persons acting under, in concert with, or for him from acquiring, accessing, using, disclosing, disseminating, transmitting,

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

transferring, copying, altering, destroying, concealing, or otherwise misappropriating Ameris's trade secrets, confidential information, privileged communications, or other protected information;

H.    For permanent injunctive relief requiring Byrne and/or his agents, servants, employees, and all persons acting under, in concert with, or for him to account for any and all uses of Ameris's confidential, proprietary, trade secret and/or attorney-client privileged information and communications, including all use and disclosure thereof, including disclosing the identities of all entities and individuals to which any disclosure was made;

I.    For permanent injunctive relief requiring Byrne and/or his agents, servants, employees, and all persons acting under, in concert with, or for him to return any and all Ameris's devices and property, including confidential, proprietary, trade secret and/or privileged documents and/or communications in their possession, custody or control;

J.    For permanent injunctive relief prohibiting Byrne and/or his agents, servants, employees, and all persons acting under, in concert with, or for him from violating Byrne's confidentiality obligations to Ameris;

K.    Awarding taxable costs of suit; and

L.    Awarding such other and further legal and equitable relief as this Court deems just and proper.

Dated:  July 30, 2026                    **NUKK-FREEMAN & CERRA**

By:    _/s/ Kirsten McCaw Grossman_
Kirsten McCaw Grossman, Esq.
Moira Heiges-Goepfert, Esq.
Stacy L. Fode, Esq.
*Attorney for Plaintiff*
AMERIS BANK

---

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Ameris hereby demands a jury trial on all issues triable as of right to a jury.

Dated:  July 30, 2026                    **NUKK-FREEMAN & CERRA**

By:
                    _/s/ Kirsten McCaw Grossman_
                    Kirsten McCaw Grossman, Esq.
                    Moira Heiges-Goepfert, Esq.
                    Stacy L. Fode, Esq.
                    *Attorney for Plaintiff*
                    AMERIS BANK

---

*AMERIS BANK v. PATRICK BYRNE*                    Case No.  8:26-cv-00393-MWC-JDE
AMENDED COMPLAINT                                                    Page 47