**REDACTED**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 8:26-cv-00393-MWC-JDE Date: September 24, 2026

Title: Ameris Bank v. Patrick Byrne

Present: The Honorable Michelle Williams Court, United States District Judge

| T. Jackson | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| N/A | N/A |

**Proceedings: (IN CHAMBERS) ORDER DENYING DEFENDANT'S MOTION TO DISMISS (DKT. [45]) AND VACATING HEARING**

Before the Court is a Motion to Dismiss for failure to state a claim ("Motion") filed by Defendant Patrick Byrne ("Defendant" or "Byrne"). Dkt. # 45 ("*Mot.*"). In support of his Motion, Defendant filed the Declaration of Catriona M. Lavery, Dkt. # 45-1, and an exhibit attached thereto, Dkt. # 45-2. Plaintiff Ameris Bank ("Plaintiff" or "Ameris") opposed, Dkt # 49 ("*Opp.*"), and Defendant replied, Dkt. # 53 ("*Reply*"). The Court finds this matter appropriate for decision without oral argument. *See* Fed. R. Civ. P. 78; L.R. 7–15. Having considered the papers, the Court **DENIES** Defendant's Motion to Dismiss and **VACATES** the Motion hearing set for September 25, 2026.

I. <u>Procedural History</u>

Ameris filed its initial Complaint on February 20, 2026, asserting five causes of action against Byrne: (I) Breach of Contract; (II) Trade Secret Misappropriation in Violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1832 *et seq.* ("DTSA"), (III) Trade Secret Misappropriation in Violation of Cal. Civ. Code §§ 3426 *et seq.* ("CUTSA"), (IV) Violation of California Penal Code § 502, and (V) Conversion. *See* Dkt. # 1 ("*Compl.*").

On May 18, 2026, Byrne moved to dismiss the Complaint. Dkt. # 20. The same day, Byrne filed a Notice of Related Cases. Dkt. # 23. On May 29, 2026, the Court, finding this case sufficiently related to the Prior Action, transferred the case to its docket. Dkt. # 24. From June 2 to June 15, 2026, the Court held trial in the Prior Action. *Byrne*, 8:24-cv-01989-MWC, Dkts. # 194–230. The jury found for Byrne on all claims and awarded punitive damages. *Id.*, Dkts. # 227, 237. Among other findings, the jury found

that Byrne engaged in protected activity by repeatedly complaining that Ameris was improperly withholding LTIP compensation owed to himself and other Balboa employees, *id.*, Dkt. # 227 ¶ 6, and that Ameris failed to prove by clear and convincing evidence that it would have terminated Byrne anyway for legitimate, independent reasons, *id.*, Dkt. # 227 ¶ 12. The jury also found Byrne substantially performed his obligations under the Employment Agreement and LTIP. *Id.*, Dkt. # 227 ¶ 19; *see* Dkt. # 246 ¶ 8. On June 29, 2026, the Court issued Findings of Fact and Conclusions of Law in the Prior Action to resolve Byrne's equitable claim for a violation of California's Unfair Competition Law. *Byrne*, 8:24-cv-01989-MWC, Dkt. # 246. In doing so, the Court adopted the relevant factual findings made by the jury. *See id.*

On July 9, 2026, the Court granted in part Byrne's Motion to Dismiss Ameris's Complaint and dismissed the breach of contract claim without leave to amend, dismissed the second and third claims for trade secret misappropriation and fourth claim for violation of California Penal Code section 502 with leave to amend, and denied the motion as to the claim for conversion. *See* Dkt. # 33 ("*MTD Order*") at 22. Ameris filed its First Amended Complaint ("FAC") on July 30, 2026. *See* Dkt. # 37 ("*FAC*"). On August 13, 2026, Byrne filed the instant Motion to Dismiss the FAC. *See Mot.* The Motion is fully briefed and ripe for disposition.

## II. Factual Background

This dispute between Plaintiff employer and Defendant former employee concerns trade secret misappropriation after Defendant allegedly improperly retained Plaintiff's confidential information ("CI"), proprietary information, and trade secret information ("TSI") for personal use. *See generally FAC*. The FAC alleges as follows:

Ameris is a state-chartered publicly traded bank headquartered in Atlanta, Georgia and regulated and insured by the Federal Deposit Insurance Corporation. *Id.* ¶¶ 17–18. Balboa Capital Corporation ("Balboa") was an online provider of business lending solutions to small and mid-sized businesses nationwide for the purchase or lease of equipment. *Id.* ¶¶ 19–20. Byrne was Balboa's co-founder, sole owner, and CEO. *Id.* ¶¶ 21–22. On December 10, 2021, Byrne, Balboa and Ameris entered into a Stock Purchase Agreement pursuant to which Ameris acquired Balboa as a division of Ameris and hired Byrne as the Balboa division's CEO. *Id.* ¶¶ 23–24. Byrne's employment was governed by an Employment Agreement with a three-year term ending December 31, 2024, and the option to renew. *Id.* ¶ 25. As the Balboa division's CEO, Byrne was subject to Ameris's policies and procedures, including policies "specifically designed to maintain the secrecy

of [CI], proprietary [information] and [TSI] held by Ameris and to which certain Ameris employees, like Byrne, had access." *Id.* ¶ 2.

"Byrne did not comply with his contractual duties to maintain the secrecy of the confidential, proprietary and trade secret information to which he had access as an Ameris employee." *Id.* ¶ 3. Byrne sent hundreds of documents containing Ameris's CI, proprietary information, and TSI from his Ameris email account to his personal, unencrypted email account "in blatant disregard of Ameris policy." *Id.* The documents contained personally identifiable information ("PII") regarding Ameris employees and customers, attorney-client privileged communications, documents protected under the Bank Examination Privilege, detailed, commercially sensitive trade secret information relating to Ameris customers and their loans (including customers' names, dates of birth, credit scores, and social security numbers), and other detailed proprietary information and TSI relating to Ameris, its business operations and finances. *Id.*

Byrne's unauthorized transfers created separate copies of Ameris's documents and data outside Ameris's network system and gave Byrne personal control, and power of disposal that he did not possess and was not entitled to merely by being an Ameris employee. *Id.* ¶ 4. Byrne's actions were neither authorized nor necessary for the performance of his job, but were instead for his own personal benefit, including advancing his litigation position and personal business interests. *Id.* ¶ 5.

Byrne's access to Ameris's computer networks and software, his Ameris-issued laptop and Ameris email account during his employment never gave him ownership of Ameris documents and data, or permission to transmit, copy, retain or use Ameris information through his personal email account, personal laptop computers, or any other personal cloud storage or account. *Id.* ¶ 6. Ameris at all times retained ownership and the right to control, restrict, revoke, preserve, and delete copies maintained within its systems, and its policies strictly forbade transmitting, copying, retaining or using information outside of Ameris-approved networks and devices. *Id.* Byrne knew his transmission, copying, retention and use of Ameris's documents and data violated his contractual agreements and Ameris policies. *Id.* ¶ 7. Byrne repeatedly tried to control, conceal, and minimize his misappropriation of Ameris's CI, proprietary information, and TSI, including withholding evidence of misappropriation in his lawsuit against Ameris ("Prior Action", Case No. 8:24-cv-01989-MWC), selectively disclosing misappropriated documents to others, and refusing to return wrongfully acquired documents. *Id.*

Upon discovering the misappropriation in September 2025, and on several subsequent occasions, Ameris demanded Byrne return and destroy the CI, proprietary information, and TSI he took from Ameris, which Byrne "repeatedly and categorically refused." *Id.* ¶ 8. Despite testifying at trial in the Prior Action that he didn't want the documents and was "absolutely" willing to return them, Byrne continued to refuse to return and destroy the information he took from Ameris. *Id.* Byrne also refused to return his Ameris laptop after his termination. *Id.* Upon information and belief, Byrne knew that doing so would have expedited Ameris's discovery of his theft. *Id.*

The information uncovered to date in Ameris's ongoing investigation shows that Byrne breached his contractual obligations to Ameris and misappropriated documents containing CI, proprietary information, and TSI belonging to Ameris. *Id.* ¶ 9. Byrne's conduct and continued possession of these documents was and is deliberate, unlawful, and poses the very real risk of a data breach. *Id.* In addition to damages, Ameris seeks a permanent injunction requiring Byrne to return the stolen documents without retaining any copies or forensic artifacts or other data from which the documents or information therein can be recreated. *Id.* Ameris also requests injunctive relief requiring the immediate return of the Ameris laptop Byrne used while employed. *Id.*

A. <u>Access to Ameris's Confidential, Proprietary and Trade Secret Information</u>

As Balboa's CEO, Byrne had access to highly valuable CI, proprietary information and TSI, some of which would be highly valuable to a competitor or bad actor engaging in criminal conduct. *Id.* ¶¶ 30, 34. The information Byrne had access to included CI as defined in his Confidential Information Agreement ("CIA") with Ameris, which included:

> contractual agreements with Ameris customers; lists of past, present and prospective customers, customer files and/or customer correspondence, customer requirements and other customer data not generally available to the public, including customer information within the scope of the GLBA; Ameris financial and marketing information and projections, including, but not limited to, market surveys, marketing objectives and marketing strategies; Ameris products and services and pricing for same, information about costs, profits, sales and markets, Ameris internal legal metrics; and Ameris business methods and procedures, including, but not limited to, Ameris operations and/or processes.

*Id.* ¶ 30. Byrne also had access to Balboa division employees' CI, including contact information, information on wages, bonuses, incentives and tax withholding, 401(k) and Roth IRA contributions, insurance, leaves of absence and paid time off. *Id.* ¶ 31.

B. Byrne's Contractual Obligations to Safeguard Ameris's CI, Proprietary Information and TSI

Ameris invests millions of dollars annually into systems, processes and employee training necessary to generate and secure the CI, proprietary information, and TSI, and requires employees to enter confidentiality and policy compliance agreements. *Id.* ¶¶ 32–33, 35. Byrne was required to annually acknowledge compliance with these policies and procedures, including specifically acknowledging the confidentiality of Ameris's proprietary information and TSI. *Id.* ¶ 36. Byrne electronically signed Ameris's CIA, which states: "except as required in the course of . . . employment by [Ameris], [Byrne] will not duplicate, remove, transfer, disclose or utilize, nor knowingly allow any other person to duplicate, remove, transfer, disclose or utilize" Ameris CI and/or trade secrets. *Id.* ¶ 37. The CIA also required Byrne "hold all such [CI] in strict confidence, and not publish or otherwise disclose any portion thereof during . . . employment and for a two (2) year period after termination except with prior written consent of the President of Ameris Bank." *Id.* ¶ 38. The CIA required Byrne "make no use of any such [CI]" except as required in performing his duties for Ameris "or with prior written consent of the President of [Ameris]." *Id.* ¶ 39. Upon employment termination, the CIA required Byrne:

> deliver to Ameris Bank, without copying or summarizing, all written materials and all models, mechanisms, documents, records, and tangible things and the like containing or relating to such Confidential Information, all of which shall be and remain the sole property of Ameris Bank. For this purpose, 'written materials' shall be deemed to include letters, memoranda, reports, notes, notebooks, books of account, data, drawings, prints, plans, specifications, formulas and all other documents or writings, and all copies thereof."

*Id.* ¶ 40. The CIA's Trade Secrets provision contained similar requirements. *Id.* ¶ 41. The CIA entitles Ameris to recover attorneys' fees, costs, and expenses, in addition to damages and other remedies if it brings an action to enforce its rights under the CIA. *Id.* ¶ 42.

C. Acceptable Use Policy ("AUP")

Byrne electronically signed Ameris's AUP which lists permitted and prohibited uses of Ameris's computer systems, networks, mobile devices, removeable media, internet, voice systems, and email communications. *Id.* ¶ 43. The AUP states that employees have a "duty under law to safeguard this information, to ensure its accuracy and protect its privacy. It is likewise the bank's duty under law to ensure that its employees honor their legal obligations[.]" *Id.* ¶ 44. The AUP requires using "extreme caution when communicating confidential or sensitive information via email" and reminds that "all email messages sent outside of Ameris Bank become the property of the receiver." *Id.* ¶ 45.

The AUP also requires locking unattended computers, logging off when leaving the bank, immediately reporting lost/stolen Ameris equipment, changing passwords on suspicion that it is no longer secure, to meet or exceed network requirements, and/or when required by established parameters for password age; and prohibiting the use of portable storage devices and drives. *Id.* ¶ 46. The AUP expressly prohibits:

> a. '[Sending] customer information, such as account numbers, passwords, etc., by unencrypted email'; b. 'Accessing personal email . . . accounts. . . .'; c. 'Connecting non-approved . . . computing devices [including personal computers] to the Ameris network . . . unless specifically authorized by the Information Technology [("IT")"] Department . . . . Only approved devices . . . may be used to connect to the [Ameris] network.'; d. '[Using] email in any way that violates [Ameris] policies . . . ; e. '[Using] [Ameris] equipment . . . for any purpose other than that authorized by the Chief Innovation Officer or his designee.' f. 'Viewing, copying, altering, or [deleting] . . . files . . . without authorized permission'; and g. 'Sending or forwarding [emails] to third party email systems with the intent of circumnavigating [Ameris] Email [AUP], [AUP], Information Security Policy or security procedures.'

*Id.* ¶ 47 (cleaned up). The AUP requires immediately reporting an information breach, including communications containing attachments with potential PII (i.e. tax or client records, financial statements, SSN, credit information, etc.), information that would be considered Ameris's intellectual property or which could negatively impact Ameris's operations if exposed to competitors, information that could expose Ameris to litigation,

and "information not specifically listed . . . which poses a risk to [Ameris]." *Id.* ¶ 48. Employees who violate the AUP may be subject to disciplinary action, including written warnings, revocation of access privileges, and termination. *Id.* ¶ 50.

D. Code of Conduct

Byrne also acknowledged and was required to follow Ameris's Code of Business Conduct and Ethics ("Code"). *Id.* ¶ 51. Paragraph 6 of the Code prohibits "taking . . . personal opportunities . . . discovered through the use of corporate property, information or position without the consent of the Board of Directors" and prohibits the use of "corporate property, information, or position for improper personal gain." *Id.* ¶ 52. Paragraph 11 provides:

> Employees, officers and directors must maintain the confidentiality of [CI] entrusted to them by [Ameris] or its customers, suppliers or partners, except when disclosure is authorized by appropriate personnel or the Board of Directors or required by laws or regulations. [CI] includes all non-public information that might be of use to competitors, or harmful to [Ameris] or its customers, suppliers or partners, if disclosed. The obligation to preserve [CI] continues even after employment or service as a director ends.

*Id.* ¶ 53. The Code also requires "endeavor[ing] to protect [Ameris's] assets[,]" which includes protecting "proprietary information," defined to include "intellectual property such as trade secrets, patents, trademarks and copyrights, . . . [and] business, marketing and service plans, engineering and manufacturing ideas, designs, databases, records, salary information and any unpublished financial data and reports." *Id.* ¶ 54.

Byrne was never authorized to violate Ameris's policies, use his personal laptop for Ameris work, send Ameris information and documents to his personal email, copy and keep Ameris's CI, proprietary information, and TSI on personal devices, emails or other online accounts, to use such information and documents for his personal benefit, or to personally retain such information and documents for use after termination. *Id.* ¶ 56.

E. Measures to Protect Ameris's CI, Proprietary Information & TSI

At all relevant times, Ameris has maintained robust information security and privacy policies to protect consumer and employee data and other types of confidential and proprietary business information in accordance with applicable law and industry best practices, including, inter alia, adhering to or surpassing industry standards for cyber security, data encryption and network security; conducting regular risk assessments and external audits; designating personnel responsible for enforcing the security of physical and electronic information platforms and appropriately classifying, and limiting access to, confidential and proprietary information. *Id.* ¶ 58. Ameris's IT Department inventories all approved electronic devices. *Id.* ¶ 59. Only devices specifically approved by the IT Department may be connected to Ameris's computer network, and any device used to transfer or transport data must use 256-bit Advanced Encryption Standard (AES) hardware-based encryption. *Id.*

All Ameris employees must undergo training annually and on commencement of employment which covers Ameris's confidentiality and data security policies and procedures and the requirements of applicable law. *Id.* ¶ 60. Ameris policy prohibits taking and obtaining personal possession of any CI outside Ameris's physical locations, except on Ameris issued and owned computer devices, systems, servers, or networks, and then only in accordance with specific job requirements. *Id.* ¶ 61. Byrne neither requested nor received any waiver of or exceptions to this policy and understood that he was required to maintain Ameris's CI, proprietary information, and TSI in strict confidence during his employment. *Id.* ¶¶ 61, 63.

F. Discovery of Byrne's Policy Violations

Ameris terminated Byrne's employment on June 27, 2024. *Id.* ¶ 64. On September 16, 2024, Byrne filed the Prior Action against Ameris alleging wrongful termination in violation of California public policy, retaliation in violation of California Labor Code, failure to pay wages due at termination and unfair competition in violation of California law. *Id.* ¶ 65. Byrne claimed Ameris terminated him for complaining about the calculation of his Long-Term Incentive Plan ("LTIP") compensation and that Ameris improperly calculated his LTIP compensation and owes him additional compensation. *Id.* ¶ 66. Ameris denied Byrne's claims. *Id.* Ameris commenced ESI review, including the contents of Byrne's Ameris email account, in September 2025 in connection with the Prior Action. *Id.* ¶ 67. Ameris's ongoing investigation revealed that on multiple dates during his employment, Byrne sent emails from his Ameris email account to his personal

email account, attaching hundreds of documents containing highly sensitive CI, proprietary information, TSI, attorney-client privileged information, and communications relating to Ameris, and its employees and customers. *Id.* ¶ 68. Said information included:

> a. Information relating to customer leases and accounts, which included sensitive customer banking and financial information, including without limitation, dates of birth, addresses, credit scores, and social security numbers;
>
> b. Detailed nonpublic financial information relating to Ameris and the Balboa division, including profit and loss statements, budget forecasts, income projections, strategic plans and risk assessments;
>
> c. Non-public Ameris business strategy slide decks, meeting minutes and notes related to the slide decks;
>
> d. Non-public financial information relating to the contemplated acquisitions of various entities;
>
> e. Balboa division Income Statements and Balance Sheets from October 2022 - March 2024;
>
> f. PII regarding Balboa division employees, salary and bonus information and information regarding employee leaves of absence; employee names and contact information, information regarding wages, bonuses, incentives and tax withholding, 401(k) and Roth IRA contributions, insurance information, and information regarding employee leaves of absence and paid time off.
>
> g. Attorney-client privileged communications between Ameris's Chief Legal Officer and various Ameris executives;
>
> h. Legal Metrics reports containing: (1) attorney-client privileged communications and work product, including legal strategy and voluminous billing records relating to legal services provided to Balboa and Ameris; and (2) highly

sensitive customer data, including the identities and details of customer loans, payment status and guarantor information; and

i. Summaries of attorney-client and Bank Examination privileged communications.

*Id.* ¶ 69. Byrne sent many of these documents with the intent to use them in litigation against Ameris. *Id.* ¶ 70. Byrne also took and kept documents he believed would support Ameris employees who he likewise believed had claims against Ameris. *Id.* Byrne sent himself other documents to create and maintain an unauthorized personal archive of Ameris information for personal purposes unrelated to Ameris business, including his future business endeavors. *Id.*

*i. Examples of Improper Emails Containing Ameris Documents*

Examples of emails Byrne sent himself include:

On May 7, 2022, Byrne emailed his personal account a spreadsheet titled "Copy of Declines Q1 2022 with tabs.xlsx," which contains highly sensitive customer information regarding approximately 4,800 leases that included borrower names, equipment cost, equipment description, industry, parent vendor, vendor, time in business, FICO score, CBR Trades (credit bureau report tradelines), open trades (open tradelines), BCSCA (business credit score-commercial account), capacity, capacity %, Paynet score, Balboa score, credit grade, reason for decline and other notes, including financial information relating to the loans' personal guarantors. *Id.* ¶ 71.

On June 17, 2022, Byrne sent "EarlyPaymentDefaultReport.xlsx," a spreadsheet containing highly sensitive information regarding twenty-three customers' delinquent leases, including names, addresses, broker information, commission information, and amounts due for each lease/loan identified. Id. ¶ 72. The spreadsheet also contains attorney-client privileged commentary from Ameris's Legal Department regarding the leases. *Id.*

[redacted]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 8:26-cv-00393-MWC-JDE Date: September 24, 2026

Title: Ameris Bank v. Patrick Byrne

[redacted]

On March 10, 11, and 30, April 6, 13, and 27, May 4, and August 24 of 2022, Byrne sent spreadsheets titled "LegalMetrics.xlsx," containing detailed legal metric reports for hundreds of leases with lease numbers and associated lessee names, including details related to lawsuits filed by Balboa, such as key litigation dates, amounts sought by Balboa, counsel information, attorney fees incurred, invoiced, and legal line items for amounts invoiced. *Id.* ¶ 74.

[redacted]

On September 7, 2022, Byrne sent several spreadsheets, including one titled "Top Vendors AUG 8-31-22.xls," containing highly sensitive information regarding Ameris's vendors, including a ranked list of the top 100 vendors, with names and amounts funded by each vendor. *Id.* ¶ 76.

On July 18, 2023, Byrne sent a Statement of Work from an Ameris vendor for a risk modeling project, containing highly sensitive information regarding Ameris's risk strategies. *Id.* ¶ 77. On August 28, 2023, Byrne sent a spreadsheet titled "Tax Refunds and Settlement.xlsx" containing highly confidential tax information. *Id.* ¶ 78. On January 21, 2024, Byrne sent attorney-client privileged communications regarding the elimination of another employee's position. *Id.* ¶ 79. On January 25, 2024, Byrne sent including the comments from another Ameris employee's performance review. *Id.* ¶ 80. On March 8, 2024, Byrne sent an email regarding personnel issues with a former executive employee, Robert Rasmussen, who subsequently sued Ameris Bank (the lawsuit was voluntarily dismissed). *Id.* ¶ 81.

G. <u>Byrne's Retention of Ameris Documents Post-Termination</u>

Byrne sent documents to his personal email throughout his employment, with an uptick in said emails in his final days of employment as he gathered information for future litigation, business endeavors, and other personal use. *Id.* ¶ 82. [redacted]

[redacted]

[redacted]

Comparing the produced documents with the emails Ameris discovered in its ESI review revealed that Byrne only produced misappropriated documents he thought would further his litigation objectives. *Id.* ¶ 86. Byrne withheld misappropriated documents, including, those containing details relating to Ameris's customers and loans, attorney-client privileged communications and employee PII. *Id.* Byrne did not produce the emails forwarding Ameris documents to his personal email. *Id.* ¶ 87. On information and belief, this was in an attempt to conceal how Byrne came to possess the documents. *Id.* After Ameris's requests, Byrne produced some of the emails from his personal account attaching the documents he took, but not until December 1, 2025, the day after discovery closed in the Prior Action. *Id.* ¶ 88.

In his October 27, 2025, deposition in connection with the Prior Action, Byrne admitted to emailing numerous documents from his Ameris account to his personal email. *Id.* ¶ 89. Byrne also admitted that the Ameris's non-public financial information (including profit and loss statements, Balboa assets, liability and equity, budget forecasts and income projections), information relating to Balboa's loans, loan

assessments, risk assessments, strategic plans, priorities and timelines, client information, and personal information about Balboa's employees, including salary, overtime, sales and origination quotas, and performance evaluations, was confidential. *Id.* Byrne conceded that most of the documents he sent to his personal email contained confidential Ameris information. *Id.*

Byrne acknowledged at his deposition that he had saved certain Ameris documents on his personal computer and had stored "things in the cloud." *Id.* ¶ 90. He testified that he understood that he was prohibited from removing or transferring confidential or TSI, "except for as required in the course of his or her employment." *Id.* ¶ 91. Because transmission of this information was neither permitted nor required for his employment, Byrne knew that his conduct violated his contractual obligations and other Ameris policies. *Id.* Byrne further understood that he was required to return the company's confidential information upon termination of employment. *Id.* ¶ 92.

When asked whether he had permission to send himself Ameris documents, Byrne responded, "it was pretty common knowledge that I would use my personal computer for – yeah, to work at home." *Id.* ¶ 93. Ameris personnel never gave Byrne permission to transmit Ameris documents to his personal email (or any other non-Ameris account), to use his personal computer to review such documents, to copy and store Ameris's CI, proprietary information, and TSI on personal devices, private email accounts or other online accounts, to use such information and documents for personal benefit in his litigation or business endeavors outside the scope of his employment with Ameris, or to permanently retain such information and documents for his own use after termination. *Id.* ¶ 94. Ameris policies make it abundantly clear that these practices are strictly forbidden. *Id.* When pressed as to whether he received express permission to send himself Ameris documents, Byrne admitted that he did not know if he "got specific permission to send documents." *Id.* ¶ 95. Byrne further testified that he could not recall whether anyone at Ameris authorized him to keep Ameris documents after his employment ended. *Id.* ¶ 96. Byrne stated that while he could not recall returning Ameris documents after his employment ended, "Ameris never asked for them back as well." *Id.* ¶ 97. In fact, Ameris did ask, in writing, for Byrne to return any Ameris property and "company confidential trade secret, client or customer information" at the time he was terminated and many times thereafter. *Id.* ¶ 98.

When asked why he sent himself Ameris documents, Byrne replied, "it was pretty clear that [he] was going to use them for this lawsuit" because he "didn't feel confident

that Ameris would disclose" the documents. *Id.* ¶ 99. Byrne stated that when he took many of the documents, he knew he would likely be terminated and specifically intended to use said documents in litigation. *Id.* ¶ 100. Byrne stated that he took the documents "for the benefit of myself" as well as for the benefit of "150 other people who weren't paid" based on his belief that he could use the documents in litigation to ensure that "the 150 employees [would] get paid." *Id.*

Byrne further testified that he had sent all the forwarded Ameris documents to his then counsel, Esperanza Anderson ("Anderson"). *Id.* ¶ 101. Many of the documents Byrne emailed to himself had no relevance to his litigation. *Id*. In the Prior Action, Byne only produced the documents he believed supported his claims against Ameris and withheld and retained the rest for his own benefit. *Id.* At trial in the Prior Action, Byrne again testified that he took and retained Ameris's documents to be able to "prove [his] point" in litigation. *Id.* ¶ 103. Byrne made no effort to ensure that Anderson returned the documents containing Ameris's CI, proprietary information, and TSI when he retained new counsel. *Id.* ¶ 102.

H. Ameris's Efforts to Recover CI, Proprietary Information, TSI, and Property

In June 28, 2024, correspondence immediately after Byrne's termination, Ameris requested Byrne return his Ameris-owned laptop, which Byrne refused. *Id.* ¶¶ 104–05. After his termination, Ameris "locked" the laptop Byrne retained to revoke access to its contents, including locally saved documents. *Id.* ¶ 106. Once returned, Ameris could unlock the laptop to see Byrne's activity. *Id.* Ameris continued demanding Byrne return the laptop and any Ameris property he retained, including on January 7, January 17, March 4, November 6, and November 12, 2025. *Id.* ¶ 107. Byrne insisted he had no Ameris property and claimed he could not recall what happened to the laptop. *Id.* ¶¶ 107–08.

In a November 12, 2025, meet and confer with Byrne's counsel, Ameris's counsel again demanded return of Ameris's property, and inquired as to Byrne's claim at deposition that he sent all the documents he had emailed himself to Anderson. *Id.* ¶ 110. In November 12, 2025, correspondence with Ameris's counsel, Anderson stated: "I have received many emails from [Byrne] from his email account shortly before his deposition and that I have not had a chance to parse through them." *Id.* ¶ 111. Anderson further stated: "I told you that I will produce any documents . . . responsive to the discovery requests and that I would search for, return and purge any documents that are privileged." *Id.* ¶ 112. Ameris's demand to return documents was not limited to privileged documents,

but rather all documents containing Ameris's CI, proprietary information, and TSI, including privileged documents. *Id.* In November 17, 2025, correspondence to Anderson, Ameris's counsel reiterated its demand to identify and return Ameris documents and property. *Id.* ¶ 113. Byrne did not produce, redact, or return any of the requested documents by the close of discovery on November 28, 2025. *Id.* ¶ 114. Anderson never returned Ameris's documents, and Byrne never requested Anderson do so. *Id.* ¶ 115.

At a July 2, 2026, meet and confer, Ameris's counsel requested return of the documents and a reasonable forensic protocol to identify and remove Ameris documents from Byrne's devices. *Id.* ¶ 118. On July 29, 2026, Ameris's counsel wrote to Byrne's counsel reiterating its demand to return the misappropriated documents and agree to a reasonable forensic protocol. *Id.* ¶ 120. To date, Byrne has not returned any documents he took from Ameris and has expressly rejected the demand for a reasonable forensic protocol. *Id.* ¶ 119.

I. Unauthorized Disclosure of CI, Proprietary Information TSI

On January 13, 2026, Ameris received the file of Deborah Dickson ("Dickson"), Byrne's economic expert in the Prior Action, which contained emails from Byrne's former employee, Jacqueline Emert ("Emert"), to Dickson on November 25, 2025, and December 18, 2025, attaching, inter alia, a spreadsheet containing a confidential pricing model with Ameris's non-public financial data. *Id.* ¶¶ 121–22. The spreadsheet was among the documents Byrne emailed himself for personal use, which Byrne likely improperly disclosed to Emert in connection with his litigation. *Id.* ¶¶ 122–23. Byrne and Emert had a close working relationship, and Emert was personally involved in Byrne's lawsuit against Ameris and provided Dickson confidential Ameris documents at Byrne's request. *Id.* ¶ 123.

Byrne has likely disclosed, and will continue to disclose CI, proprietary information, and TSI to Emert in connection with Emert's anticipated litigation against Ameris. *Id.* ¶ 124. Through the same counsel representing Byrne, Emert recently sent Ameris a letter requesting her personnel file records in anticipation of litigation against Ameris. *Id.*

Byrne testified under oath that he took CI, proprietary information, and TSI from Ameris intending to use it in litigation for his benefit and that of the "150 other people" (including Emert) Byrne he believes were subject to the LTIP's compensation provisions. *Id.* ¶ 125. Byrne already disclosed Ameris's CI, proprietary information, and TSI to Emert,

and, on information and belief, will continue to do so, per his stated intention to use such information to benefit "150 other people" in litigation. *Id.* ¶ 126.

On July 28, 2026, Byrne's counsel issued a press release in connection with the judgment entered in the Prior Action, which confirmed his counsel's intent to institute litigation on behalf of the same employees Byrne claimed that he took misappropriated documents on behalf of:

> 'This case was never about just one plaintiff,' . . . 'Roughly 150 employees transitioned from Balboa Capital to Ameris, and many were potentially affected by the same LTIP practice, resulting in underpaid earned wages. Allen Matkins is preparing additional claims on behalf of other affected individuals.'

*Id.* ¶ 127. On information and belief, Byrne and/or his counsel utilized CI, proprietary information and TSI contained in documents covered by the parties' Protective Order in the Prior Action and documents Byrne removed from but did not produce in the Prior Action in order to prepare litigation on behalf of other Ameris employees. *Id.* ¶ 128.

J. <u>Byrne's Use of CI for Personal Business Purposes</u>

Byrne intentionally used Ameris's CI, proprietary information and TSI to compile a personal archive of Ameris data for personal purposes unrelated to Ameris's business, including his own business endeavors. *Id.* ¶ 129. On information and belief, Byrne is in the early stages of developing another business enterprise. *Id.* ¶ 130. Byrne has access to confidential Ameris employee contact and salary information and other HR related data that he has used, and may continue using, to recruit Ameris employees to join his business, and to otherwise develop his business. *Id.* ¶ 131. "[O]n information and belief, Byrne already relied on Ameris information to recruit two former Ameris employees, Maddie Lucas and Nic Olmedo, both of whom were previously Loan Operations managers for Ameris, to join his new business." *Id.* Byrne engaged Emert to actively recruit current Ameris employees, including those in the Loan Operations department to work for Byrne's new business. *Id.* ¶ 132. Byrne continues to disclose Ameris's CI, proprietary information, and TSI to Emert to advantage and grow his new business. *Id.*

Byrne has offered no explanation whatsoever for his repeated refusal to return Ameris's CI, proprietary information, and trade secret documents, nor has he offered any

explanation for his unwillingness to enter a reasonable forensic protocol. *Id.* ¶ 133. Byrne's repeated insistence on keeping Ameris documents that he knows he has no legal right to plausibly supports his past and continuing intent to use them for unauthorized personal purposes. *Id.*

K. Risk of Data Breach

Byrne's continued retention and use of Ameris's CI and trade secret material "adds to the serous risks of a data breach." *Id.* ¶ 134. Byrne's personal email provider does not offer native, built-in, end-to-end encryption, meaning the email contents are not encrypted such that only the sender and recipient can access them. *Id.* ¶ 135. Anyone with access to Byrne's personal email may access the plain text of his email messages and documents. *Id.* The Ameris documents in Byrne's possession are also stored on his personal computer, cloud accounts, and potentially other devices and accounts, which are not secure. *Id.* ¶ 136.

III. Legal Standard

A. Rule 12(b)(6)

Federal Rule of Civil Procedure ("Rule") 8 requires a complaint to clearly establish the claims and parties such that a defendant would have "no difficulty in responding to the claims with an answer and/or with a Rule 12(b)(6) motion to dismiss." *Hearns v. San Bernardino Police Dep't*, 530 F.3d 1124, 1131–32 (9th Cir. 2008). Pleadings that are "verbose, confusing and conclusory" are subject to dismissal. *Nevijel v. N. Coast Life Ins. Co.*, 651 F.2d 671, 674 (9th Cir. 1981). A plaintiff fails to comply with Rule 8 if "all defendants are lumped together in a single, broad allegation." *Gauvin v. Trombatore*, 682 F. Supp. 1067, 1071 (N.D. Cal. 1988).

A defendant may move to dismiss a claim in the plaintiff's complaint if the allegation "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "At the pleading stage, all allegations of material fact are taken as true and construed in the light most favorable to the non-moving party." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020). To survive a motion to dismiss under Rule 12(b)(6), the plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell At. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court

to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

As such, the plausibility standard is a "context-specific task that requires the reviewing court to [1] draw on its judicial experience and common sense," *Iqbal*, 556 U.S. at 679, and [2] to "'draw all reasonable inferences in favor of the nonmoving party.'" *Boquist v. Courtney*, 32 F.4th 764, 773 (9th Cir. 2022) (quoting *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014)). "Ultimately, dismissal is proper under Rule 12(b)(6) if it appears beyond doubt that the non-movant can prove no set of facts to support its claims." *Id.* at 773–74 (internal citation and quotation marks omitted) (cleaned up). However, "[c]onclusory allegations and unreasonable inferences do not provide [ ] a basis" for determining a plaintiff is entitled to relief. *Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948, 954 (9th Cir. 2023) (citation omitted); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) ("The court is not required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.") (cleaned up). Nor may the Court accept legal conclusions and threadbare recitals of the elements of a cause of action. *Malheur Forest Fairness Coal. v. Iron Triangle, LLC*, 164 F.4th 710, 723 (9th Cir. 2026) ("Plausibility requires pleading facts, as opposed to conclusory allegations or the formulaic recitation of the elements of a cause of action, and must rise above the mere conceivability or possibility of unlawful conduct that entitles the pleader to relief.") (citation omitted); *Detwiler v. Mid-Columbia Med. Ctr.*, 156 F.4th 886, 893 (9th Cir. 2025); *Doe I v. Cysco Sys., Inc.*, 73 F.4th 700, 713 (9th Cir. 2023) ("Although a reviewing court must accept a complaint's factual allegations as true, the same is not true of legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.") (cleaned up).

Though resolution of a motion to dismiss under Rule 12(b)(6) is normally confined to the allegations stated in the complaint, the court "may also 'consider [1] materials that are submitted with and attached to the complaint'; [2] 'judicial notice of matters of public record'; and [3] unattached evidence on which the complaint necessarily relies if: [a] the complaint refers to the document; [b] the document is central to the plaintiff's claim; and [c] no party questions the authenticity of the document.'" *Beverly Oaks Physicians Surgical Ctr., LLC v. Blue Cross & Blue Shield of Ill.*, 983 F.3d 435, 439 (9th Cir. 2020) (cleaned up) (quoting *United States v. Corinthian Colls.*, 655 F.3d 984, 998–99 (9th Cir. 2011)).

IV. Discussion

A. Claims Two and Three: Misappropriation of Trade Secrets under DTSA and CUTSA

Defendant argues that the FAC failed to allege misappropriation for three reasons: (1) the FAC fails to allege improper acquisition by failing to allege improper means of acquiring the alleged trade secret materials; (2) the FAC merely alleges improper possession and thus fails to plead improper use; and (3) the FAC's only alleged improper disclosure is litigation-related transmission, which, alone, does not establish actionable misappropriation. *Mot.* at 11–18. Because the Court finds sufficient the FAC's allegations of improper acquisition, and because improper use is not a required element of a claim for misappropriation, the Court need not reach Defendant's third argument in denying his Motion to Dismiss the misappropriation claims.

Courts analyze Defense of Trade Secrets Act ("DTSA") and California Uniform Trade Secrets Act ("CUTSA") claims together because the elements are substantially similar. *See InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020). "To succeed on a claim for misappropriation of trade secrets under the DTSA, a plaintiff must prove: (1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." *Id.* at 657–58. Misappropriation can be asserted as either (1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means or (2) disclosure or use of a trade secret of another without express or implied consent. *See* 18 U.S.C.A. § 1839(5); Cal. Civ. Code § 3426.1(b).

*i. The FAC Sufficiently Alleges Plaintiff's Possession Of Trade Secrets.*

A trade secret is financial, scientific, business, economic, technical, or engineering information that (1) the owner has taken reasonable measures to keep secret, (2) derives independent economic value from not being generally known to or readily accessible by the public through proper means, and (3) is related to a product or service used in or intended for use in interstate or foreign commerce. *See* 18 U.S.C. §§ 1836(b), 1839(3). The plaintiff "'should describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade.'" *Imax Corp. v. Cinea Technologies, Inc.*, 152 F.3d 1161, 1164–65 (9th Cir. 1998) (emphasis in original) (citation omitted).

*a. Safeguarding Measures*

The FAC alleges that Ameris "closely guards" its alleged trade secrets, including "providing unique usernames and passwords for logging in to the Ameris database, secured portal access, and utilizing encryption programs, among other security measures." *FAC* ¶¶ 155, 179. The Court's prior Order found these allegations, coupled with allegations—which the FAC repleads—that "Ameris trained Byrne on data security and confidentiality policies and procedures, and required him to sign the Confidential Information Agreement and Acceptable Use Policy to prevent the disclosure of trade secrets[,]" sufficient to establish that Ameris "took reasonable measures to keep this information secret." *MTD Order* at 15 (citing *Compl.* ¶¶ 48, 121); *FAC* ¶¶ 60, 155, 179. Accordingly, the Court finds these allegations remain sufficient to establish Plaintiff's reasonable steps to protect its trade secrets. *See 7EDU Impact Academy Inc. v. You*, 760 F. Supp. 3d 981, 996 (N.D. Cal. 2024) (finding reasonable steps to protect trade secrets where plaintiff stored them in a password-protected database and disseminated the company's trade secrets policy).

*b. Independent Economic Value*

"To have independent economic value, a trade secret must be 'sufficiently valuable and secret to afford an actual or potential economic advantage over others.'" *Calendar Rsch. LLC v. StubHub, Inc.*, No. 2:17-CV-04062-SVW-SS, 2017 WL 10378336, at *3 (C.D. Cal. Aug. 16, 2017) (citation omitted). "Independent economic value can be shown by 'circumstantial evidence of the resources invested in producing the information, the precautions taken to protect its secrecy, and the willingness of others to pay for its access.'" *Id.* (citation omitted). "The standard to show that trade secrets derive economic value is not a high standard." *Id.* at *4.

The alleged trade secrets in the FAC include:

> a. Information relating to customer leases and accounts, which included sensitive customer banking and financial information, including without limitation, dates of birth, addresses, credit scores, and social security numbers;
>
> b. Detailed nonpublic financial information relating to Ameris and the Balboa division, including profit and loss statements, budget forecasts, income projections, strategic plans and risk assessments;

c. Non-public Ameris business strategy slide decks, meeting minutes and notes related to the slide decks;

d. Non-public financial information relating to the contemplated acquisitions of various entities;

e. Balboa division Income Statements and Balance Sheets from October 2022 - March 2024, and more.

f. PII regarding Balboa division employees, salary and bonus information and information regarding employee leaves of absence; employee names and contact information, information regarding wages, bonuses, incentives and tax withholding, 401(k) and Roth IRA contributions, insurance information, and information regarding employee leaves of absence and paid time off.

g. Attorney-client privileged communications between Ameris's Chief Legal Officer and various Ameris executives;

h. Legal Metrics reports containing: 1) attorney-client privileged communications and work product, including legal strategy and voluminous billing records relating to legal services provided to Balboa and Ameris; and 2) highly sensitive customer data, including the identities and details of customer loans, payment status and guarantor information; and

i. Summaries of attorney-client and bank examination privileged communications.

*FAC* ¶ 62. The FAC also alleges that Byrne sent a confidential pricing model containing Ameris' non-public financial data to Emert which was "not generally available to Emert during the course of her work at Ameris." *Id.* at ¶ 103.

Here, the FAC "describe[s] the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade." *Imax Corp.*,

152 F.3d at 1164–65. And courts have found information like the trade secrets alleged above to constitute protectable trade secrets. *See, e.g., MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993) (customer database constituted trade secret with potential economic values because it allows a competitor . . . to direct its sales efforts to those potential customers that are already using the MAI computer system."); *First-Citizens Bank & Tr. Co. v. HSBC Holdings plc*, No. 23-CV-02483-LB, 2024 WL 115933, at *11 (N.D. Cal. Jan. 10, 2024) (finding trade secrets where "tethering of [employee contact] information to salary, markets, skills, and business relationships . . . makes them protectible and valuable."); *TEG Staffing, Inc. v. Platt*, No. 09-CV-0003 H (POR), 2009 WL 10725672, at *5 (S.D. Cal. Feb. 5, 2009) ("In California, customer lists may constitute trade secrets") (quoting *Thompson v. Impaxx, Inc.*, 113 Cal. App. 4th 1425, 1429 (Cal. Ct. App. 2003)).

"Thus, at the current stage of litigation and construing the facts in favor of Plaintiff as the nonmoving party, the Court finds that Plaintiff has sufficiently alleged that the disputed information . . . qualifies as trade secrets." *Luminate Home Loans, Inc. v. Better Mortg. Co.*, No. 24-CV-2251-BAS-MSB, 2025 WL 3265817, at *5–6 (S.D. Cal. Nov. 21, 2025) (finding sufficient pleading of independent economic value at motion to dismiss stage where plaintiff "alleged it expended effort to cultivate and organize the [trade secrets]" and alleged that "misappropriation of such [trade secrets] would provide a substantial business advantage to Defendant as Plaintiff's competitor.").

*c. Use in interstate or foreign commerce*

The DTSA requires the trade secret to be "related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C.A. § 1836(b)(1). As stated in the prior Order, Ameris's allegations relate the trade secrets in question to its engagement in interstate commerce, which is plausible as Ameris is a nationwide, publicly traded bank. *See MTD Order* at 17; *FAC* ¶¶ 17, 151–52. Thus, the FAC sufficiently pleads that the allegedly misappropriated information constitutes trade secrets.

*ii. The FAC in/Sufficiently Alleges Misappropriation*

Misappropriation involves either (1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means or (2) disclosure or use of a trade secret of another without express or implied consent. *See* 18 U.S.C.A. § 1839(5); Cal. Civ. Code § 3426.1(b). Under CUTSA, "improper means" is defined to include "theft, bribery, misrepresentation, breach or

inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means. Reverse engineering or independent derivation alone shall not be considered improper means." Cal. Civ. Code § 3426.1(a); *see also* 18 U.S.C.A. § 1839(6) (defining improper means to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy . . . .").

Here, the FAC alleges "intentional and improper" acquisition of trade secrets for unauthorized purposes, not in the "ordinary course of business." *Opp'n* at 19–22; *see also FAC* ¶¶ 147–192. The FAC further alleges that Byrne's misappropriation has caused damages, including costs relating to ensuring legal and regulatory compliance, costs to address Byrne's data breach. *See, e.g., FAC* ¶¶ 168, 192. Though Defendant does not contest the alleged damages, Defendant seeks to dismiss the FAC's misappropriation claims on the same grounds as their previous dismissal: "fail[ure] to allege that Byrne *used* trade secrets for some illegitimate purpose beyond mere possession." *Mot.* at 11 (citing *MTD Order* at 18) (emphasis added). But DTSA and CUTSA defined misappropriation to include improper acquisition *or* unauthorized disclosure or use—there is no requirement that a plaintiff bringing a claim for misappropriation plead *both*. *See* 18 U.S.C.A. § 1839(5) (defining misappropriation as improper acquisition under (5)(A) *or* disclosure or use under (5)(B)); Cal. Civ. Code §§ 3426.1(b)(1)–(b) (2) ("'Misappropriation means'. . . Acquisition of a trade secret . . . by improper means; *or* . . . Disclosure or use of a trade secret . . . without express or implied consent . . . .") (emphasis added); *see also Dealertrack, Inc. v. Huber*, 460 F. Supp. 2d 1177, 1184 (C.D. Cal. 2006) (denying motion to dismiss and rejecting plaintiff's argument "that Defendants have not alleged the misappropriation of the trade secret because Defendants have not alleged use of the information obtained. . . . [T]he UTSA does not require such allegations.").

In alleging that Byrne breached his duties to maintain the secrecy of the alleged trade secrets by transferring the material to his personal email address in violation of Ameris's policies, the FAC sufficiently alleges improper acquisition. *See, e.g., Flextronics AP, LLC v. Ricci*, No. 26-CV-00117-PCP, 2026 WL 2227360, at *11 (N.D. Cal. Aug. 3, 2026) ("A departing employee's retention of trade-secret information without permission amounts to improper acquisition sufficient to allege misappropriation under CUTSA.") (citation omitted); *Bradford Aquatic Grp., LLC v. Condor, Inc.*, No. 2:23-CV-09374-MEMF-AJR, 2024 WL 6963877, at *12 (C.D. Cal. Oct. 4, 2024) (finding misappropriation by improper acquisition sufficiently pleaded where plaintiffs allege that Defendant "'surreptitiously downloaded or otherwise retained copies of Plaintiffs' Trade Secrets, namely Bradford Products' pricing calculator and Plaintiffs' customer lists and contact

information.'" Which Plaintiffs allege was "prohibited by policies that [Defendant] had previously agreed to follow."); *VibrantCare Rehab., Inc. v. Deol*, No. 2:20-CV-00791-MCE-AC, 2021 WL 1614692, at *4 (E.D. Cal. Apr. 26, 2021) (finding misappropriation "sufficiently pled" where "Plaintiff specifically details how Defendant sent herself the trade secret information via email, in violation of her contract and her fiduciary duties.").

Because Plaintiff has sufficiently pled misappropriation by improper acquisition, the Court need not address Byrne's arguments to dismiss Plaintiff's theory of misappropriation through unauthorized use. *See, e.g., MicroVention, Inc. v. Balt USA, LLC*, No. 820CV02400JLSKES, 2021 WL 4734611, at *4 n.3 (C.D. Cal. Sept. 9, 2021) ("Although the parties discuss the other means by which a plaintiff can show misappropriation—namely, improper acquisition or disclosure—because a plaintiff must plausibly allege only one in order to state a claim, it is not necessary for the Court to address these arguments.").

Accordingly, the Court **DENIES** Defendant's Motion to Dismiss Plaintiff's causes of action for misappropriation under CUTSA and DTSA.

B. Claim Four: Violation of Cal. Penal Code Section 502

California Penal Code "Section 502 is an anti-hacking statute," under the California Comprehensive Data and Fraud Act ("CDAFA"), "intended to prohibit the unauthorized use of any computer system for improper or illegitimate purpose." *Custom Packaging Supply, Inc. v. Phillips*, 2015 WL 8334793, at *3 (C.D. Cal. Dec. 7, 2015). The FAC alleges that Byrne violated California Penal Code sections 502(c)(1), 502(c)(2), and 502(c)(7), which enumerate public offenses where a person:

> (1) Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data.
>
> (2) Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or

> external to a computer, computer system, or computer network. . . .
>
> (7) Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network.

Cal. Penal Code § 502; *FAC* ¶¶ 199–201. Section 502(e) (1) provides a civil cause of action to "the owner or lessee of the computer, computer system, computer network, computer program, or data who suffers damage or loss by reason of a violation of any of the provisions of subdivision (c)."

Here, Defendant argues that his conduct was performed within the scope of lawful employment and is thus exempt from liability under Penal Code section 502, and that the FAC independently fails to plead violations of the relevant subsections due to its failure to plead the "without permission" element. *Mot.* at 18–23. The Court disagrees—the FAC proffers ample allegations to this end.

"[U]nlike the CFAA, which criminalizes only 'unauthorized access,' the CDAFA also criminalizes 'unauthorized use.'" *Volkswagen Grp. of Am., Inc. v. Smartcar, Inc.*, No. 21-CV-04895-JST, 2022 WL 20184651, at *5 (N.D. Cal. July 7, 2022) (citation omitted). Section 502 prohibits unauthorized access as defined to include "logging into a database with a valid password and subsequently taking, copying, or using the information in the database improperly." *United States v. Christensen*, 828 F.3d 763, 789 (9th Cir. 2015); *see also Rebecca Bamberger Works, LLC v. Bamberger*, No. 24-CV-706 JLS (DDL), 2024 WL 2805323, at *5 (S.D. Cal. May 31, 2024) ("CDAFA does not apply solely to 'hackers'") (citing *Christensen*, 828 F.3d at 789).

"Implicit in the definition of authorization is the notion that someone, including an entity, can grant or revoke that permission." *United States v. Nosal*, 844 F.3d 1024, 1035–36 (9th Cir. 2016). A defendant may violate section 502 even where initial access is permitted, but subsequent access exceeds the scope of permissible use. *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1069 (9th Cir. 2016) (affirming finding of section 502 and CFAA violation where defendant exceeded scope of initially authorized use); *see also Ticketmaster L.L.C. v. Prestige Ent. W., Inc.*, 315 F. Supp. 3d 1147, 1167–68 (C.D. Cal. 2018) (citing *Facebook*, 844 F.3d at1065–66) ("The CFAA prohibits computer trespass by those who are not authorized users or who exceed authorized use."). *W. States Reg'l Council of Carpenters v. Starr*, No. 3:25-CV-02544-GPC-JLB, 2026 WL

747421, at *16 (S.D. Cal. Mar. 17, 2026) ("Unauthorized taking or use of information" under Section 502(c) "can also encapsulate accessing, taking, copying, and making use of computer data that one formerly—but no longer—had authorization to access.").

Byrne argues that the FAC fails to identify "what permission Byrne lacked, who revoked it or limited it, when such revocation occurred, what specific systems or data he was prohibited from accessing, or how any particular access exceeded the scope of his authority[.]" *Mot.* at 22. Byrne is mistaken. The FAC alleges that Byrne electronically signed Ameris's AUP, which prohibited employees from "Viewing, copying, altering, or [deleting] . . . files . . . without authorized permission" and prohibited "Sending or forwarding [emails] to third party email systems with the intent of circumnavigating [Ameris] Email [AUP], [AUP], Information Security Policy or security procedures." *FAC* ¶¶ 47, 44. The FAC further alleges that "Ameris personnel never gave Byrne permission to transmit Ameris documents to his personal email account (or any other non-Ameris account)" or to use personal devices to review or store such material. *Id.* ¶ 94. The FAC goes on to allege dates of unauthorized transfers and the specific document titles and contents which Byrne improperly [redacted] in violation of Ameris's policies. *See id.* ¶¶ 71–84. The FAC also contains detailed allegations regarding Byrne's retention of a laptop belonging to Ameris, and Ameris's extensive efforts to seek the return of said laptop despite Byrne's ongoing refusal. *See, e.g., id.* ¶¶ 104–110, 113. These allegations sufficiently establish the elements of Ameris's section 502(c) claims at the pleading stage. *See, e.g., WalkMe Ltd. v. Whatfix, Inc.*, No. 23-CV-03991-JSW, 2024 WL 1221960, at *6 (N.D. Cal. Mar. 21, 2024) (denying motion to dismiss and finding allegations like those in *Christensen*—"logging into a database with a valid password and subsequently taking, copying, or using the information in the database improperly"— sufficiently stated a claim under section 502(c)); *see also PerkinElmer Health Scis., Inc. v. Mahnaz Salem*, No. CV 21-1619-DMG (KSX), 2021 WL 2548684, at *3 (C.D. Cal. Apr. 9, 2021) (finding likelihood of success on section 502 claim where evidence showed confidentiality agreement authorized defendant to access data, but "not . . . to take it for her own personal use [and] . . . certainly not . . . to disclose it to a competitor or keep it beyond her employment in defiance of [employer's] request for its return.").

The Court is unpersuaded by Byrne's contention that the FAC merely alleges conduct within the scope of his "allowed access necessary to his daily job functions as CEO." *Mot.* at 22. As discussed, *supra*, the FAC clearly alleges that Byrne improperly transferred materials to his personal email account in violation of Ameris's policies and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 8:26-cv-00393-MWC-JDE Date: September 24, 2026

Title: Ameris Bank v. Patrick Byrne

that he continues to improperly retain Ameris documents and an Ameris laptop in violation of their policy. *FAC* ¶ 8. [redacted] Accordingly, the Court **DENIES** Byrne's Motion to Dismiss the section 502 claims. *See W. States Reg'l Council of Carpenters*, 2026 WL 747421, at *16 (denying motion to dismiss where allegations that plaintiff terminated defendant's employment and ordered return of company laptop "demonstrate that Plaintiff knew she no longer had permission to access Plaintiff's computer system and data" and allegations of continued possession and use of laptop and employer property "for personal use" sufficiently alleged section 502 claim); *see also WalkMe Ltd.*, 2024 WL 1221960, at *6 (denying motion to dismiss where plaintiff alleged that defendant improperly exceeded scope of previously-authorized access under similar circumstances).

V. <u>Conclusion</u>

The Court **DENIES** Defendant's Motion to Dismiss (Dkt. # 45) and **VACATES** the hearing set for September 25, 2026.

**IT IS SO ORDERED.**

:

**Initials of Preparer** TJ